The Honorable David G. Estudillo

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| GATHER CHURCH,<br><br>          *Plaintiff*,<br><br>    v.<br><br>LEWIS COUNTY, SEAN SWOPE in his official capacity as Lewis County Commissioner, LINDSEY POLLOCK in her official capacity as Lewis County Commissioner, SCOTT BRUMMER in his official capacity as LEWIS COUNTY COMMISSIONER, SHERIFF ROBERT SNAZA in his official capacity as Lewis County Sheriff, and MEJA HANDLEN, in her official capacity as Director of the Lewis County Public Health & Social Services.<br><br>          *Defendants*. | Case No. 3:25-cv-05850-DGE<br><br>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION<br><br>NOTE ON MOTION CALENDAR:<br><br>NOVEMBER 14, 2025<br><br>ORAL ARGUMENT REQUESTED |

Pl.'s Mot. for Prelim. Inj. - 1
Case No. 3:25-cv-05850-DGE

American Civil Liberties Union
425 California St., 7th Floor, San Francisco, CA 94104
212-549-2500

# TABLE OF CONTENTS

**Table of Authorities**.................................................................................................... **3**

**INTRODUCTION** ...................................................................................................... **6**

**FACTUAL BACKGROUND** ...................................................................................... **7**

I.   Plaintiff Operated an SSP That Offered Evidence-Based Lifesaving Health Services and Connected Patients to Drug Rehabilitation.................................................................. 7

II.   Lewis County Passed an Ordinance Dramatically Limiting Operation of SSPs .............. 11

III.   The Ordinance Curtailed Gather's SSP Operations and Prevents Disabled People from Accessing the SSP.......................................................................................................... 11

**LEGAL STANDARD** ................................................................................................ **15**

**ARGUMENT** ............................................................................................................. **15**

I.   Plaintiff Is Likely to Succeed on Its ADA and Section 504 Claims ................................ 16

A.   Plaintiff's Patients Have Disabilities ............................................................. 16

B.   Gather's Patients are Discriminated Against on the Basis of Their Disabilities.......... 18

II.   Plaintiffs Are Likely to Succeed On the Merits of their WLAD Claim........................... 25

III.   Plaintiff Is Likely to Succeed on the Merits of Its State Law Preemption Claims ....... 26

IV.   Plaintiff and Its Patients Face Irreparable Harm Absent Preliminary Relief................ 27

V.   The Balance of Equities and Public Interest Weigh in Favor of Granting Preliminary Relief..................................................................................................................... 28

Pl.'s Mot. for Prelim. Inj. -2
Case No. 3:25-cv-05850-DGE

American Civil Liberties Union
425 California St., 7th Floor, San Francisco, CA 94104
212-549-2500

## Table of Authorities

**Cases**

*A Helping Hand, LLC v. Baltimore Cnty., MD*, 515 F.3d 356 (4th Cir. 2008) ............................. 16

*Bay Area Addiction Rsch. & Treatment, Inc. v. City of Antioch*, 179 F.3d 725 (9th Cir. 1999) ... 19, 22

*California v. Azar*, 911 F.3d 558 (9th Cir. 2018) ............................................... 29

*Cannabis Action Coal. v. City of Kent*, 351 P.3d 151 (Wash. 2015) ............................................ 27

*Children's All. v. City of Bellevue*, 950 F. Supp. 1491 (W.D. Wash. 1997) ............................... 25

*Crowder v. Kitagawa*, 81 F.3d 1480 (9th Cir. 1996) ......................................................... 21

*Doukas v. Metro. Life Ins. Co.*, 950 F. Supp. 422 (D.N.H. 1996) ......................................... 21

*Duvall v. Cnty. of Kitsap*, 260 F.3d 1124 (9th Cir. 2001). ................................................ 16

*Ent. Indus. Coal. v. Tacoma-Pierce Cnty. Health Dep't*, 105 P.3d 985 (Wash. 2005) ............. 26, 27

*Guerra v. West Los Angeles College*, 812 F. App'x 612 (9th Cir. 2020). .................................... 24

*Habit Mgmt., Inc. v. City of Lynn*, 235 F. Supp. 2d 28 (D. Mass. 2002) ................................... 20

*Hale v. Wellpinit Sch. Dist. No. 49*, 198 P.3d 1021 (Wash. 2009) ........................................... 25

*Howell v. Dep't of Soc. & Health Servs.*, 436 P.3d 368 (Wash. Ct. App. 2019) ........................... 25

*Idaho Org. of Res. Councils v. Labrador*, 780 F. Supp. 3d 1013 (D. Idaho 2025) ...................... 29

*Immigrant Legal Res. Ctr. v. City of McFarland*, 472 F. Supp. 3d 779 (E.D. Cal. 2020) ........... 28

*Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37 (2d Cir. 1997) ................. 20, 22

*James v. City of Costa Mesa*, 700 F.3d 394 (9th Cir. 2012) ................................................ 18

*Labowitz v. Bird Rides, Inc.*, CV-18-9329-MWF, 2020 WL 2334116 (C.D. Cal. Mar. 31, 2020).24

*MX Grp., Inc. v. City of Covington*, 293 F.3d 326 (6th Cir. 2002) ....................................... 16, 20

*New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293 (3d Cir. 2007) ..................... 19

*Nken v. Holder*, 556 U.S. 418 (2009) ................................................................... 15

*Rodde v. Bonta*, 357 F.3d 988 (9th Cir. 2004) ...................................................... 22, 28, 29

*Schmitt v. Kaiser Found. Health Plan of Washington*, 965 F.3d 945 (9th Cir. 2020) .................. 19

*Segura v. United States*, 418 F. Supp. 3d 605 (E.D. Wash. 2019) ................................... 26

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814 (9th Cir. 2001) ............. 27

*Smith-Berch, Inc. v. Baltimore Cnty., Md.*, 68 F. Supp. 2d 602 (D. Md. 1999) ............... 20, 22, 23

*Spokane Cnty. Health Dist. v. Brockett*, 839 P.2d 324 (Wash. 1992). ........................................ 26

*Taylor v. Burlington N. R.R. Holdings, Inc.*, 444 P.3d 606 (Wash. 2019) ............................... 25

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................... 15

**Statutes**

29 U.S.C. § 794 ......................................................................... 16

42 U.S.C. § 12102 ................................................................. 16, 17

42 U.S.C. § 12132 ................................................................. 16, 21

42 U.S.C. § 12210 ................................................................. 17, 18, 21

Lewis County, Wash. code § 8.80.010 ........................................ 18, 20

Pl.'s Mot. for Prelim. Inj. -3
Case No. 3:25-cv-05850-DGE

American Civil Liberties Union
425 California St., 7th Floor, San Francisco, CA 94104
212-549-2500

Lewis County, Wash. code § 8.80.020 ........................................................... 11
Lewis County, Wash. code § 8.80.040 ........................................................... 11
Lewis County, Wash. code § 8.80.050 ........................................................... 11
Lewis County, Wash. code § 8.80.110 ........................................................... 11
Lewis County, Wash. code § 8.80.160 ........................................................... 11
Wash. Rev. Code § 69.50.4121 .............................................................. 26, 27
Wash. Rev. Code § 69.50.612 ...................................................................... 27
Wash. Rev. Code § 49.60.020 ...................................................................... 25
Wash. Rev. Code § 49.60.030 ...................................................................... 25
Wash. Rev. Code § 49.60.040 ...................................................................... 26

**Regulations**

28 C.F.R. § 35.130 ........................................................................................ 21
28 C.F.R. pt. 35 app. B ................................................................................. 21
U.S. Equal Emp't Opportunity Comm'n, Section 902 Definition of the Term Disability § 902.6...
    18

**Internet Sources**

Google Maps, *Driving Distance from Packwood, WA to 727 N. Tower Ave., Centralia, WA*
    https://tinyurl.com/ycx56fm9 (last visited May 15, 2025) ..................................... 12
Google Maps, *Driving Distance from Winlock, WA to 727 N. Tower Ave., Centralia, WA*
    https://tinyurl.com/mwn56man (accessed May 15, 2025).................................... 12
Google Maps, *Transit from Packwood, WA to 727 N. Tower Ave., Centralia, WA*
    https://tinyurl.com/ycx56fm9 (last visited May 15, 2025). ................................. 12
Google Maps, *Transit from Winlock, WA to 727 N. Tower Ave., Centralia, WA*
    https://tinyurl.com/mwn56man (last visited May 15, 2025)................................. 12
*Rhode Island*  https://data.census.gov/profile?g=040XX00US44&codeset=naics~422460 ........ 12
Susan Kingston et al., *Overview and Perspectives of Syringe Services Programs in Washington
    State* (Feb. 2023), ADAI, University of Washington, https://adai.uw.edu/wordpress/wp-
    content/uploads/dlm_uploads/2023-SSP-Operations-Report.pdf................................. 9
U.S. Census Bureau, *Lewis County, Washington*
    https://data.census.gov/profile/Lewis_County,_W...?g=050XX00US53041......................... 12
U.S. Drug Enforcement Admin., *Public Safety Alert: DEA Reports Widespread Threat of
    Fentanyl Mixed with Xylazine,* https://www.dea.gov/alert/dea-reports-widespread-threat-
    fentanyl-mixed-xylazine (last visited Oct. 14, 2025)......................................... 8
Wash. State Dep't of Health, *Recommendation: Needs-Based Syringe Access* (2019),
    https://doh.wa.gov/sites/default/files/legacy/Documents/Pubs/150-122-
    WADOHSyringeAccessRecommendation2019.pdf?uid=63caf6804848b ............................ 8, 9
Wash. State Dep't of Health, *Syringe Service Programs*, https://doh.wa.gov/you-and-your-
    family/drug-user-health/syringe-service-programs (last visited Sept. 11, 2025)...................... 9

Pl.'s Mot. for Prelim. Inj. -4
Case No. 3:25-cv-05850-DGE

American Civil Liberties Union
425 California St., 7th Floor, San Francisco, CA 94104
212-549-2500

Wash. State Dep't of Health, *The Essential Role of Syringe Service Programs in Preventing Overdose Deaths* (Nov. 2024), https://doh.wa.gov/sites/default/files/2024-11/150297-RoleSSPsInOverdoseResponse.pdf. ............................................................................ 8

**INTRODUCTION**

Plaintiff Gather Church ("Gather" or "Plaintiff") operates the only syringe services program ("SSP") in Lewis County, Washington. From October 2019 to April 2024, Gather's SSP served the vast majority of its patients via its mobile clinic, traveling directly to patients with substance use disorder ("SUD") whose disabilities and lack of transportation prevent them from traveling to Gather's fixed location in Centralia, Washington. Gather's SSP provided public health supplies, including sterile needles to people who might otherwise use contaminated supplies to inject drugs. By offering these supplies, Gather provided potentially-lifesaving healthcare, offered compassion, and built trust, which it leveraged to encourage patients to receive other health services, including Gather's drug rehabilitation programs. This continuum of services was partially funded by the Washington State Department of Health ("Health Department"), which views SSPs as central to the state's response to the opioid crisis.

But in April 2024, Defendant Lewis County enacted an ordinance (the "Ordinance") that dramatically curtails Gather's ability to provide these services. The Ordinance prohibits Gather's SSP[1] from operating any mobile services. The Ordinance further bans the distribution of "drug paraphernalia," defined to include public health supplies like fentanyl testing strips that can prevent deadly overdoses. As a result, Gather cannot travel to meet clients and must operate its SSP only in a single location in Centralia. Even at its fixed location, Gather's ability to provide health services has been dramatically restricted.

These restrictions frustrate the state's public health efforts and endanger the community. Prior to the Ordinance, Gather's SSP served as many as 400 people per month, almost all through its mobile clinic. That number has dramatically fallen and now Gather serves only about 11 people per month. The Ordinance has also undermined the SSP's ability to connect patients to drug rehabilitation. Prior to the Ordinance, an average of six people per month

---

[1] Although the Ordinance would apply to any SSP in Lewis County, Gather is the only entity providing such services.

American Civil Liberties Union
425 California St., 7th Floor, San Francisco, CA 94104
212-549-2500

entered Gather's drug rehabilitation clinic based on a referral from the SSP. Now the number is closer to two.

Beyond its deadly effect on public health, the Ordinance is in direct violation of federal and state law, including their prohibitions on disability discrimination. Specifically, by imposing onerous restrictions that limit the availability of Gather's SSP, the Ordinance targets health services designed specifically for people with disabilities. In so doing, the Ordinance facially discriminates against disabled people and denies them meaningful access to health services they require.

Plaintiff meets the requirements for a preliminary injunction. First, Gather is likely to succeed on the merits. The Ordinance discriminates based on disability, in violation of Title II of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Section 504"), and the Washington Law Against Discrimination ("WLAD"). The Ordinance is also preempted by state law, which encourages the very conduct the Ordinance prohibits. Second, a preliminary injunction is required to prevent irreparable harm to Gather and its patients, including disabled residents who lack access to Gather's SSP and face elevated risks of infection, overdose, and death while the illegal Ordinance remains in place. Finally, the balance of equities weighs strongly in favor of an injunction because there is no public health justification for the Ordinance, which prohibits Gather from offering evidence-based health services supported and overseen by the Health Department.

**FACTUAL BACKGROUND**

**I. Plaintiff Operated an SSP That Offered Evidence-Based Lifesaving Health Services and Connected Patients to Drug Rehabilitation**

In furtherance of its religious mission to serve the vulnerable, Gather started its first services in 2010 at the height of the opioid epidemic. Declaration of Cole Meckle in Support of Plaintiff's Preliminary Injunction Motion ("Meckle Decl.") ¶¶ 6–7. Since then, Gather has expanded its operations to provide a continuum of services for people with SUD that includes a food and clothing bank; rental and employment support; a clinic that provides medication for

Pl.'s Mot. for Prelim. Inj. -7
Case No. 3:25-cv-05850-DGE

American Civil Liberties Union
425 California St., 7th Floor, San Francisco, CA 94104
212-549-2500

addiction treatment ("MAT"), primary health care, and testing for HIV and Hepatitis C; and an intensive outpatient therapy program. *Id.* ¶ 8–22. Most of these services are delivered remotely for people who cannot travel to Gather's Centralia location. *Id.*

To address the reality that people with SUD frequently face barriers to accessing healthcare and drug rehabilitation services, compounded by their mistrust of medical professionals, Gather sought and won a grant in 2019 from the Health Department to launch an SSP. *Id.* ¶ 24. Decades of research establish that SSPs provide two key categories of public health benefits. First, by distributing sterile syringes and other public health supplies, SSPs substantially reduce transmission of communicable diseases among drug users and the wider community.[2] Declaration of Dr. Ricky Bluthenthal in Support of Plaintiff's Preliminary Injunction Motion ("Bluthenthal Decl.") ¶¶ 30, 42–53. Second, SSPs facilitate access to drug rehabilitation and other health services that people with SUD would otherwise not access. *Id.* ¶¶ 54–56. The Health Department has relied on this well-established research when issuing SSP grants across the state, noting that "[m]ore than 30 years of evidence [ ] supports the benefits of community-based harm reduction programs like SSPs . . . . These programs do not increase drug use or crime. But they do help improve health for people and communities, support public safety, and offer a bridge to health and social services."[3] *See* Declaration of Tara Urs in Support of Plaintiff's Motion for Preliminary Injunction ("Urs Decl."), Ex. A.

Key aspects of SSPs typically include offering sterile syringes, naloxone, fentanyl and xylazine[4] test kits, safer smoking supplies[5], disposal of used syringes, medical and mental

---

[2] Wash. State Dep't of Health, *Recommendation: Needs-Based Syringe Access* 1 (2019), https://doh.wa.gov/sites/default/files/legacy/Documents/Pubs/150-122-WADOHSyringeAccessRecommendation2019.pdf?uid=63caf6804848b.

[3] Wash. State Dep't of Health, *The Essential Role of Syringe Service Programs in Preventing Overdose Deaths* (Nov. 2024), https://doh.wa.gov/sites/default/files/2024-11/150297-RoleSSPsInOverdoseResponse.pdf.

[4] "Xylazine is a powerful sedative approved for veterinary use, which has been found in the illicit drug supply, and can cause severe skin wounds and other negative health outcomes." U.S. Drug Enforcement Admin., *Public Safety Alert: DEA Reports Widespread Threat of Fentanyl Mixed with Xylazine,* https://www.dea.gov/alert/dea-reports-widespread-threat-fentanyl-mixed-xylazine (last visited Oct. 14, 2025).

[5] Smoking supplies provide a safer alternative to injecting drugs, both in terms of disease transmission and reducing overdose deaths. They also reduce disease transmission by providing alternatives to sharing pipes. Bluthenthal Decl. ¶ 50.

Pl.'s Mot. for Prelim. Inj. -8
Case No. 3:25-cv-05850-DGE

American Civil Liberties Union
425 California St., 7th Floor, San Francisco, CA 94104
212-549-2500

health care, and SUD treatment.[6] Especially in rural communities, it is often essential that SSPs operate mobile units because many patients are otherwise unable to access its services. Bluthenthal Decl. ¶¶ 52–53; Declaration of James Pugel in Support of Plaintiff's Preliminary Injunction Motion ("Pugel Decl.") ¶ 34. Evidence shows that connection with an SSP program is a strong predictor that a drug user will eventually enter drug rehabilitation treatment and stop using drugs. Bluthenthal Decl. ¶¶ 54–56; Urs Decl., Ex. A. It is also well-established that the health benefits of SSPs are strengthened by increasing access to sterile syringes, including by operating a mobile clinic and distributing syringes on an "as-needed" basis, rather than requiring a one-to-one exchange of used to sterile syringes. Bluthenthal Decl. ¶¶ 42, 52–53. Distributing these supplies does not increase crime, drug use, or syringe litter. *Id.* ¶¶ 57–63; Pugel Decl.¶¶ 36–39. Instead, without these supplies, individuals use drugs at the same rate using contaminated or make-shift supplies that threaten the health of the individual, community, and law enforcement and are less likely to enter drug rehabilitation. Bluthenthal Decl. ¶¶ 57–63; Pugel Decl. ¶¶ 36, 42.

Today, the Health Department funds SSPs in 26 counties[7] that offer some or all of these key elements of effective SSPs, including sterile syringes on an as-needed basis, as recommended by the Health Department,[8] test kits, safer smoking supplies, and sterile materials that prevent infection.[9] The availability of syringes and sterile materials is consistent across SSPs.[10] Many SSPs in Washington use mobile outreach to reach patients who cannot travel,[11] like Gather did prior to the Ordinance. Indeed, the Department *requires* some SSPs, including Gather's, to provide mobile services or street outreach. Meckle Decl., Ex. F at 7.

---

[6] Susan Kingston et al., *Overview and Perspectives of Syringe Services Programs in Washington State* 1 (Feb. 2023), ADAI, University of Washington, https://adai.uw.edu/wordpress/wp-content/uploads/dlm_uploads/2023-SSP-Operations-Report.pdf.
[7] Wash. State Dep't of Health, *Syringe Service Programs*, https://doh.wa.gov/you-and-your-family/drug-user-health/syringe-service-programs (last visited Sept. 11, 2025).
[8] Wash. State Dep't of Health, *supra* note 2, at 2.
[9] Susan Kingston et al., *supra* note 7, at 1, 5–6, 8.
[10] *Id.* at 5.
[11] *Id.* at 1.

American Civil Liberties Union
425 California St., 7th Floor, San Francisco, CA 94104
212-549-2500

Prior to the Ordinance, Gather operated its SSP consistent with this research and the Health Department's recommendations. Urs Decl., Ex. A; Bluthenthal Decl. ¶¶ 70–73. Gather distributed sterile syringes on an as-needed basis, sterile materials like water and cotton to prevent infections, and fentanyl and xylazine test kits. Meckle Decl. ¶ 25. It also acquired and prepared to distribute safer smoking supplies. *Id.* Gather's SSP staff included medical professionals, people who had lived experience with SUD, and those who had used Gather's SSP in the past. Consistent with research, the involvement of people with direct experience with SUD allowed them to build trust with potential patients. *Id.* ¶ 46; Bluthenthal Decl. ¶¶ 56, 73.

And, because Lewis County is large and rural, Gather's SSP operated primarily through a mobile clinic to reach patients who could not travel to Gather's Centralia SSP. Meckle Decl. ¶ 26. The mobile clinic made visits to people with SUD at or near homeless encampments, residential areas, and public parks in Centralia, Winlock, and Packwood—a community 74 miles away from Centralia. *Id.* ¶ 28. Almost all of the SSP's patients chose to use the mobile clinic because their disabilities and lack of transportation prevented them from reaching the Centralia SSP. Declaration of Marvin Westergard in Support of Plaintiff's Motion for Preliminary Injunction ("Westergard Decl.") ¶¶ 6–7. At each site, Gather earned the trust of its patients by meeting their immediate health needs and leveraged that trust to connect patients with its services, including wound care, transportation to emergency services, the food and clothing bank, and employment and rental assistance. *Id.* ¶ 8. At its peak, Gather served an average of 400 individuals and distributed over 20,000 sterile syringes per month, all while reducing syringe litter. Meckle Decl. ¶¶ 28, 31. Not only did Gather provide essential healthcare through these encounters, it also built trusting relationships that eased patients' skepticism of medical professionals and encouraged them to receive medical services, including Gather's drug rehabilitation program. Westergard Decl. ¶ 9. Each month, the SSP successfully referred an average of six patients into Gather's MAT clinic which provided medication to treat their opioid use disorder. Meckle Decl. ¶ 30.

Pl.'s Mot. for Prelim. Inj. - 10
Case No. 3:25-cv-05850-DGE

American Civil Liberties Union
425 California St., 7th Floor, San Francisco, CA 94104
212-549-2500

In September 2023, the Washington Department of Transportation swept one of the homeless encampments in Centralia that the mobile SSP frequently visited, displacing many of its patients. *Id.* ¶ 32. Gather temporarily stopped its mobile clinic to search for patients by offering SSP services on foot at smaller encampments. *Id.* ¶ 33; Westergard Decl. ¶ 10. Gather located many of its patients, but before it could resume its mobile clinic, Lewis County passed the Ordinance. Meckle Decl. ¶ 33; Westergard Decl. ¶¶ 10–11.

**II. Lewis County Passed an Ordinance Dramatically Limiting Operation of SSPs**

In April 2024, Lewis County passed Ordinance 1354 restricting SSPs in four key ways. First, it prohibits mobile SSPs altogether unless they are stationed at a single location that has a drug treatment or mental health program ("mobile ban"). Lewis County, Wash. code § 8.80.110(1)(a). Fixed-location SSPs cannot operate in residential areas, or within 750 feet of any school, library, or public park ("geographic restrictions"). *Id.* § 8.80.110(1)–(3). Second, the Ordinance requires SSPs to "operate a one-to-one exchange, whereby a participant shall receive one sterile needle and syringe unit in exchange for each used one" ("one-to-one requirement"). *Id.* § 8.80.040. Third, the Ordinance prohibits SSPs from distributing any "drug paraphernalia" other than sterile syringes. This ban covers fentanyl and xylazine test kits, sterile water, cotton, and safer smoking supplies ("supplies ban"). *Id.* §§ 8.80.050, 8.80.020(6). Fourth, the Ordinance prohibits anyone who has been convicted of a drug crime or used the SSP in the past 24 months from working or volunteering at the SSP ("employment ban"). *Id.* § 8.80.040(1)(a)– (b). Violators of these restrictions face civil and criminal penalties. *Id.* § 8.80.160.

**III. The Ordinance Curtailed Gather's SSP Operations and Prevents Disabled People from Accessing the SSP**

Each element of the Ordinance forced Gather to dramatically change its services, at the cost of effective healthcare and treatment for the residents of Lewis County. As a result, the Ordinance has effectively eliminated access to Gather's SSP for most patients.

The Ordinance barred Gather from resuming its mobile SSP clinic, distributing fentanyl and xylazine test kits, sterile water, and cotton, and starting its safer smoking supplies program.

American Civil Liberties Union
425 California St., 7th Floor, San Francisco, CA 94104
212-549-2500

Meckle Decl. ¶ 41. Today, Gather offers only sterile syringes on a one-to-one exchange basis from its mobile unit that is required to be parked outside its Centralia clinic. *Id.* ¶ 42. This site provides the only SSP services in all of Lewis County. Gather no longer allows former SSP users or people with recent drug-related convictions to work or volunteer for the SSP. *Id.* ¶ 46.

The mobile ban and geographic restrictions drastically curtail Gather's ability to provide services to patients. Prior to the Ordinance, almost all of the SSP's patients relied on the mobile clinic because their lack of transportation and/or their SUD made travel difficult or impossible. *Id.* ¶ 26; Westgard Decl. ¶¶ 6–7. Most of Gather's mobile SSP patients were unhoused and did not have an operable car. Westgard Decl. ¶ 6. The size of Lewis County, which has a land mass double the size of Rhode Island,[12] combined with its scant public transportation, compounded these barriers. The SSP lies approximately 23 miles from Winlock and 74 miles from Packwood, two of the communities Gather's mobile SSP clinic served.[13] Public transportation to the SSP from these cities is sparse.[14] The symptoms of patients' SUD further inhibited patients' ability make and carry out plans to travel to Gather's fixed location SSP in Centralia. Westgard Decl. ¶ 6.

Many of Gather's mobile SSP patients had co-occurring mobility or mental health disabilities that made it even harder or impossible for them to travel to the Centralia SSP. These patients used wheelchairs, walkers, or canes or needed, but did not have mobility equipment and walked very slowly and with difficulty. *Id.* ¶ 7. Others had mental health disabilities that impaired their memory, executive functioning, and emotional regulation, which made it difficult for them to plan and carry out a trip to the Centralia SSP. *Id.*

---

[12] Compare U.S. Census Bureau, *Lewis County, Washington* https://data.census.gov/profile/Lewis_County,_W...?g=050XX00US53041 (stating Lewis County has 2,402.8 square miles of land area) with U.S. Census Bureau, *Rhode Island* https://data.census.gov/profile?g=040XX00US44&codeset=naics~422460 (stating Rhode Island has 1,033.9 square miles of land area).

[13] *See* Google Maps, *Driving Distance from Winlock, WA to 727 N. Tower Ave., Centralia, WA* https://tinyurl.com/mwn56man (last visited May 15, 2025); Google Maps, *Driving Distance from Packwood, WA to 727 N. Tower Ave., Centralia, WA* https://tinyurl.com/ycx56fm9 (last visited May 15, 2025).

[14] *See* Google Maps, *Transit from Winlock, WA to 727 N. Tower Ave., Centralia, WA* https://tinyurl.com/mwn56man (last visited May 15, 2025); Google Maps, *Transit from Packwood, WA to 727 N. Tower Ave., Centralia, WA* https://tinyurl.com/ycx56fm9 (last visited May 15, 2025).

Pl.'s Mot. for Prelim. Inj. - 12
Case No. 3:25-cv-05850-DGE

American Civil Liberties Union
425 California St., 7th Floor, San Francisco, CA 94104
212-549-2500

Gather has contemplated opening additional SSP locations accessible to its mobile SSP patients but cannot do so without violating the Ordinance's geographic restrictions because many patients live in or near residential areas and parks and cannot travel far. Meckle Decl. ¶ 45. Gather knows where most of its former mobile SSP patients are located. If it could resume operating a mobile SSP clinic in residential areas and near parks and distribute the same supplies it distributed before the Ordinance, it could resume providing lifesaving supplies to numerous patients and connect them with drug rehabilitation and other health services. *Id.* ¶ 33; Westergard Decl. ¶ 20.

The one-to-one requirement, supplies ban, and employment ban further undermine Gather's ability to provide SSP healthcare services effectively to those able to reach its fixed location. The few patients who manage to reach Gather's SSP can receive a limited number of syringes, forcing them to share syringes and repeatedly navigate the same barriers to obtain more. These patients cannot obtain xylazine and fentanyl test kits, sterile water, cotton, or safer smoking supplies, putting them at heightened risk of infection and overdose death from accidentally consuming drugs laced with fentanyl and xylazine. Bluthenthal Decl. ¶¶ 76–78. These limitations undermine trust with Gather's SSP providers who cannot provide key supplies and services that patients most need. *Id.* ¶ 56. Further undermining this trust, Gather cannot offer patients newly in recovery from SUD the opportunity to serve their community through the SSP. *Id.* ¶ 83.

The effect of the Ordinance has been catastrophic. Very few of Gather's former mobile SSP patients have visited the SSP's only (fixed) location in Centralia, and even fewer patients with co-occurring mobility or mental health disabilities have accessed this SSP. Westergard Decl. ¶¶ 14–18. Since April 2024, the SSP's fixed location receives an average of only 11 visitors per month. Meckle Decl. ¶ 43.

Gather's staff have attempted to build connections with vulnerable potential patients by visiting homeless encampments on foot offering services that are *not* prohibited by the mobile ban: food, clothing, wound care, emergency transportation, and transportation to the MAT

Pl.'s Mot. for Prelim. Inj. - 13
Case No. 3:25-cv-05850-DGE

American Civil Liberties Union
425 California St., 7th Floor, San Francisco, CA 94104
212-549-2500

Clinic. *Id.* ¶ 44; Westergard Decl. ¶ 19. But because Gather can no longer meet these

individuals' immediate needs, some potential patients have no interest in engaging with Gather.

Westergard Decl. ¶ 19.

As a result of the Ordinance, hundreds of people in Lewis County are unable to access

the lifesaving services of Gather's SSP. Some of Gather's SSP patients have died of overdose.

*Id.* ¶ 16. Further, the Ordinance has undermined the SSP's role in building trust and connecting

people with SUD to Gather's other health and support services, including its drug rehabilitation

programs. Since the Ordinance went into effect, the average number of people who enter

Gather's MAT Clinic each month based on a referral from the SSP has fallen from six to two.

Meckle Decl. ¶ 44; *see* Bluthenthal Decl. ¶ 83.

The experiences of two SSP patients illustrate the barriers the Ordinance has erected.

J.A. previously accessed Gather's mobile SSP near his home each week to get sterile

syringes, xylazine and fentanyl test kits, sterile water, and cotton. Declaration of J.A. in Support

of Plaintiff's Preliminary Injunction Motion ("J.A. Decl.") ¶ 5. But with severe back and leg

pain from his sciatica, J.A. can hardly walk around his block, let alone travel 1.5 miles from his

home to the SSP's fixed site. *Id.* ¶ 7. The symptoms of his SUD also impair his ability to make

and follow through with plans, including traveling to the SSP. *Id.* ¶¶ 1, 7. As a result, he walks

to the SSP only once a month, at most, which is painful and exacerbates his sciatica. *Id.* ¶ 7.

This means he often has a limited supply of sterile syringes and cannot get xylazine and

fentanyl test kits, sterile water, cotton, or safer smoking supplies. *Id.* ¶¶ 8–9.  As a result, he

shares used syringes and risks contracting an infection or communicable disease or ingesting

fentanyl or xylazine. *Id.*

J.H. has SUD, ADHD, and a traumatic brain injury that collectively impair his memory

and executive functioning. Declaration of J.H. in Support of Plaintiff's Preliminary Injunction

Motion ("J.H. Decl.") ¶¶ 1, 3. Because of his disabilities, J.H. struggles to initiate, plan, and

follow through with complex tasks, like travelling to the SSP. *Id.* ¶¶ 1, 3. As a result, he now

travels to the SSP once a month, at the most. *Id.* ¶ 4. This means he often has a limited supply of

sterile syringes, and cannot get xylazine and fentanyl test kits, sterile water, cotton, or safer

smoking supplies. *Id.* This forces J.H. to reuse dull syringes causing an abscess on his arm and

dramatically elevating his risk contracting an infection or communicable disease or ingesting

fentanyl or xylazine. *Id*. ¶¶ 4, 6.

J.A., J.H., and numerous other patients thus face immediate risks to their health and

safety. Without proper supplies, they will inevitably contract infections, transmit communicable

diseases, or accidentally ingest fentanyl and xylazine. Bluthenthal Decl. ¶¶ 78, 81.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed

on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that

the balance of equities tips in his favor, and that an injection is in the public interest." *Winter v.

Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The balance of equities and the public

interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S.

418, 435 (2009).

## ARGUMENT

Plaintiff meets the requirements for a preliminary injunction. First, Plaintiff has

established a likelihood of success on its disability discrimination claims pursuant to the ADA,

Section 504, and WLAD. In violation of these statutes, the Ordinance facially discriminates on

the basis of disability by targeting health services designed for people with SUD. The Ordinance

also discriminates in its application by denying people with SUD and co-occurring mobility and

mental health disabilities meaningful access to the SSP. Plaintiff has also established a

likelihood of success on the merits of the state preemption claims because the Ordinance

conflicts with state law. Second, the SSP's patients face imminent irreparable harm from

increased risk of infection and disease transmission. And third, because the Ordinance

endangers public health without justification, and SSPs are central to the state's public health

response to the opioid crisis, the balance of equities and the public interest weighs in favor of

preliminary relief.

American Civil Liberties Union
425 California St., 7th Floor, San Francisco, CA 94104
212-549-2500

**I.   Plaintiff Is Likely to Succeed on Its ADA and Section 504 Claims**

The ADA and Section 504 prohibit public entities from excluding disabled people from the "services, programs, or activities" of the entity or otherwise subjecting disabled people to discrimination. 42 U.S.C. § 12132; 29 U.S.C. § 794. To establish an ADA claim, Plaintiff must show: 1) its patients are qualified individuals with a disability; 2) its patients were either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or were otherwise discriminated against by the public entity; and 3) such exclusion, denial of benefits, or discrimination was by reason of disability. *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001). Section 504 applies these elements to recipients of federal funds. *Id.* Here, the record establishes each of these elements.

**A.   Plaintiff's Patients Have Disabilities**

Courts have held that drug rehabilitation clinics can challenge statutes that discriminate against their disabled patients because their services cannot be disconnected from the disabled people who require them. *See, e.g.*, *A Helping Hand, LLC v. Baltimore Cnty., MD*, 515 F.3d 356, 364 (4th Cir. 2008) ("We too find that prudential considerations do not bar the Clinic's claims under Title II of the ADA, and the Clinic has alleged a sufficient association with individuals with disabilities to state a claim under the ADA."). While Gather itself is not disabled, the ADA and Section 504 allow its remedies to be enforced by "any person alleging discrimination based on a disability." *Id.* at 362. Moreover, Section 504 protects "any person aggrieved" by the discrimination of a person on the basis of his or her disability." *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 334 (6th Cir. 2002).

Here, Gather asserts discrimination on behalf of its patients, who have disabilities for purposes of the ADA and Section 504. A "disability" under both statutes includes "a physical or mental impairment that substantially limits" a "major life activity." 42 U.S.C. § 12102(1)(A); 29 U.S.C. § 794. Here, at all relevant times, Gather's patients have had disabilities including SUD, ADHD, traumatic brain injury, sciatica, and other mobility and mental health impairments that substantially limit their major life activities, including thinking, concentrating, brain and

neurological functions, executive functioning, memory, standing, walking, and driving. *See* 42 U.S.C. § 12102(2)(A) (major life activities include learning, concentrating, thinking, standing, and walking); Westergard Decl. ¶¶ 6–7, 14–17; J.A. Decl. ¶¶ 1, 7; J.H. Decl. ¶¶ 1, 3.

Although in some instances, the ADA and Section 504 exclude from the definition of "disability" any individual "who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use," 42 U.S.C. § 12210(a), this exclusion does not apply here for two reasons.

First, even if an individual is "currently engaging in the illegal use of drugs," the ADA prohibits a public entity from "den[ying] health services, or services provided in connection with drug rehabilitation, on the basis of the current illegal use of drugs if the individual is otherwise entitled to such services." *Id.* § 12210(c) ("health services provision"). Gather's patients meet this health services provision, because the SSP is a "public health program"[15] that provides lifesaving health care services like sterile syringes, test kits, and wound care that prevent infection and transmission of communicable diseases, "improve health for people and communities" and offer a "bridge to health and social services."[16] Meckle Decl. ¶ 25. Likewise, these services are provided "in connection with drug rehabilitation" because they facilitate access to Gather's drug rehabilitation and treatment programs, including its MAT Clinic. *Id.* ¶ 30; Bluthenthal Decl. ¶¶ 54–56, 73; Urs Decl., Ex. A. Because the Ordinance denies access to these services, Plaintiff's patients are protected under the health services provision.

Second, as discussed in Section B.3.b., the Ordinance also discriminates on the basis of patients' co-occurring mobility and mental health disabilities, which are unequivocally covered by the ADA and Section 504. While

> [a] person who alleges disability based on one of the excluded conditions [such as current use of illegal drugs . . .] is not an individual with a disability under the ADA, . . . a person who has one of these conditions is an individual with a disability if (s)he has another condition that rises to the level of a disability.

---

[15] Wash. State Dep't of Health, *supra* note 7.
[16] Wash. State Dep't of Health, *supra* note 3, at 1.

American Civil Liberties Union
425 California St., 7th Floor, San Francisco, CA 94104
212-549-2500

*James v. City of Costa Mesa*, 700 F.3d 394, 397 n.3 (9th Cir. 2012) (quoting U.S. Equal Emp't Opportunity Comm'n, Section 902 Definition of the Term Disability § 902.6). Because Gather's patients assert discrimination based on their mobility and mental health disabilities, those impairments also constitute disabilities for purposes of their claims.

Plaintiff has therefore satisfied the first element of its ADA and Section 504 claims.

**B. Gather's Patients are Discriminated Against on the Basis of Their Disabilities**

Plaintiff has also satisfied the second and third elements of its ADA and Section 504 claims because the Ordinance discriminates on the basis of disability in at least three ways: 1) direct violation of the health services provision; 2) by facially denying people with SUD access to health services; and 3) in its application by denying people with SUD and co-occurring mental and physical disabilities meaningful access to health services. Any one of these theories is sufficient to succeed on these claims.

*1. The Ordinance Violates the Health Services Provision*

The Ordinance facially violates the health services provision, 42 U.S.C. 12210(c), because it denies people with SUD "health services, or services provided in connection with drug rehabilitation." The County admits that SSPs provide health services: describing SSPs as a "first contact for formal drug treatment, [and] access to health and counseling service referrals." Lewis County, Wash. code § 8.80.010. The State agrees that SSPs are "public health programs"[17] that "improve health for people and communities" and offer a "bridge to health and social services,"[18] including drug rehabilitation. Urs Decl., Ex. A; Bluthenthal Decl. ¶¶ 54–56. The Ordinance's mobile ban, geographic restrictions, supplies ban, one-to-one requirement, and employment ban each serve to deny people access to health services, because each is essential to connecting with patients and providing them health care.

---

[17] Wash. State Dep't of Health, *supra* note 6, at 2.
[18] Wash. State Dep't of Health, *supra* note 3, at 1.

American Civil Liberties Union
425 California St., 7th Floor, San Francisco, CA 94104
212-549-2500

Gather wishes to, and has previously, provided these health services to these patients. Defendants' virtual prohibition on Gather's ability to provide health services to people because of their current substance use thus violates the ADA.

### 2. The Ordinance Facially Discriminates Based on Disability

The Ordinance also discriminates on the basis of disability because it facially targets health services designed for, and that cannot be divorced from, people with SUD, rendering it facially invalid. This two-tiered system facially subjects only SSPs to onerous regulations while exempting other health services not associated with SUD, like hospitals and pharmacies. The Ninth Circuit has held that such facially discriminatory statutes "present *per se* violations" of the ADA and Section 504 because they "mak[e] distinctions based on what Congress had determined to be inappropriate considerations"—disability. *Bay Area Addiction Rsch. & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 735 (9th Cir. 1999).

Applying these principles, federal courts uniformly have found that zoning ordinances burdening access to services designed for people with drug addiction facially discriminate against disabled people. *Schmitt v. Kaiser Found. Health Plan of Washington*, 965 F.3d 945, 958 (9th Cir. 2020) ("[Proxy discrimination] arises when the defendant enacts a law or policy that treats individuals differently on the basis of seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group.").

For example, in *Bay Area Addiction Research*, the Ninth Circuit held that a moratorium on methadone clinics within 500 feet of residential areas facially discriminated against people with disabilities. 179 F.3d at 735. Specifically, because the city applied the moratorium only to methadone clinics instead of clinics providing other medical services, it singled out the clinic's disabled patients—individuals with opioid use disorders—for different treatment in violation of the ADA. *Id.* at 734–35; *see also New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 295, 306 (3d Cir. 2007) (holding as "facially invalid" a zoning statute prohibiting methadone clinics within 500 feet of residential areas and other structures); *Innovative Health*

Pl.'s Mot. for Prelim. Inj. - 19
Case No. 3:25-cv-05850-DGE

*Sys., Inc. v. City of White Plains*, 117 F.3d 37, 49 (2d Cir. 1997) (holding that interpretation of a zoning ordinance to prohibit an alcohol treatment facility facially violated the ADA); *MX Grp.*, 293 F.3d at 330 (finding "blanket prohibition of all methadone clinics from the entire city is discriminatory on its face"); *Habit Mgmt., Inc. v. City of Lynn*, 235 F. Supp. 2d 28, 29 (D. Mass. 2002) (holding that city ordinance prohibiting establishment of methadone clinics within two miles of schools is facially invalid).

The same logic applies here, with greater force, because the Ordinance facially singles out health services designed for people with SUD for different treatment under the County's zoning laws. Indeed, the Ordinance requires only SSPs to follow onerous restrictions on location, distribution of "drug paraphernalia," and employment, while other entities that provide medical services, including mobile services, such as pharmacies, hospitals, and health clinics, remain exempt from these limits. The County admits that SSPs provide health services designed for people with SUD as a "first contact for formal drug treatment, [and] access to health and counseling service referrals." Lewis County, Wash. code § 8.80.010. Because, therefore, the Ordinance targets a "clinically-proven and governmentally-approved form of [healthcare]" that "cannot be divorced from the individuals" with SUD who require them, it facially discriminates against those individuals on the basis of their disability. *See Smith-Berch, Inc. v. Baltimore Cnty., Md.*, 68 F. Supp. 2d 602, 621 (D. Md. 1999) ("Since [t]he dispensing of methadone cannot be divorced from the individuals who take medication, the County's special methadone policy discriminate[s] against those patients whose addiction requires methadone for effective treatment.") (citation modified). The Ordinance thus presents a "*per se* violation" of the ADA and Section 504 and is facially invalid.

### 3. *The Ordinance Discriminates in Its Application Against People with SUD and People with Co-Occurring Mobility and Mental Health Disabilities*

Finally, the Ordinance discriminates in its application by impairing access to health services uniquely required by people with SUD, including those who also have co-occurring mobility and mental health disabilities. First, the Ordinance impairs access to Gather's SSP for

American Civil Liberties Union
425 California St., 7th Floor, San Francisco, CA 94104
212-549-2500

people with SUD because the symptoms of their addiction and lack of transportation make travel to the fixed SSP site onerous. Second, the Ordinance's mobile ban and geographic restrictions impose even greater burdens on patients with co-occurring mobility and mental health disabilities, who struggle to leave their location and need the mobile clinic to access the SSP. By failing to make reasonable modifications to the Ordinance that restore access to the SSP, the County has denied disabled people meaningful access to health services and services provided in connection with drug rehabilitation.

### a. Lewis County Must Provide Disabled People Meaningful Access to Health Services

The ADA and Section 504 prohibit public entities from excluding disabled people from the "services, programs, or activities" of the entity or otherwise subjecting disabled people to discrimination. 42 U.S.C. § 12132. Although people currently using illegal drugs are excluded from the definition of "disability," public entities cannot deny these individuals "health services, or services provided in connection with drug rehabilitation." *Id.* § 12210(c). The regulations implementing the ADA and Section 504 make clear that these prohibitions extend to "nonessential policies and practices that are neutral on their face but deny individuals with disabilities an effective opportunity to participate" in a service or program. 28 C.F.R. pt. 35 app. B (citing § 35.130).

The Ninth Circuit defines disability discrimination broadly to prohibit any policy that "burdens [disabled people] in a manner different and greater than it burdens others" or denies disabled people "meaningful access to the benefits" of a service or program. *Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir. 1996). Courts have thus invalidated policies that, "while not creating a direct bar to individuals with disabilities, diminish such individuals' chances of participation." *Doukas v. Metro. Life Ins. Co.*, 950 F. Supp. 422, 426 (D.N.H. 1996); *see also* 28 C.F.R. § 35.130(b)(1)(ii)–(iii), (b)(8). Once discrimination is established, a public entity must make "reasonable modifications" to its policies to avoid further discrimination. *Crowder*, 81 F.3d at 1484; 28 C.F.R. § 35.130(b)(7)(i). These requirements apply to "anything a public entity

Pl.'s Mot. for Prelim. Inj. -21
Case No. 3:25-cv-05850-DGE

American Civil Liberties Union
425 California St., 7th Floor, San Francisco, CA 94104
212-549-2500

does," *Bay Area Addiction Rsch.*, 179 F.3d at 732, but they are not limited to conduct that occurs in the entity's program—they "prohibit[] all discrimination by a public entity, regardless of the context." *Innovative Health Sys., Inc.*, 117 F.3d at 44–45.

Two cases illustrate how these principles apply to zoning and public health regulations like the Ordinance that deny disabled people meaningful access to health services that they need. In *Smith-Berch, Inc.*, the court held that Baltimore County discriminated against people with opioid use disorder by requiring only methadone clinics to undergo a public hearing before obtaining a zoning permit. 68 F. Supp. 2d at 607–08. The hearing requirement ultimately prevented plaintiff from opening a clinic to address the "pressing need" for additional methadone treatment amid the County's "escalating heroin problem." *Id.* at 607. Because "[t]he dispensing of methadone cannot be divorced from the [disabled] individuals who take the medication," the court held that the public hearing requirement imposed greater burdens on people with opioid use disorder, denying them meaningful access to a "clinically-proven and governmentally-approved form of treatment." *Id.* at 621–22.

And in *Rodde v. Bonta*, the Ninth Circuit invalidated the closure of a county hospital that housed health and rehabilitation services uniquely required by disabled patients. 357 F.3d 988, 998–1000 (9th Cir. 2004). While disabled people "could theoretically seek service from the remaining facilities, the evidence suggested . . . that the services designed for the general population would not adequately serve the[ir] unique needs." *Id.* at 998. The closure thus disproportionately burdened and discriminated against disabled patients because it "reduce[d], and in some instances eliminate[d], necessary medical services for disabled Medi-Cal patients while continuing to provide the medical care required and sought by Medi-Cal recipients without disabilities." *Id.*

**b. The Ordinance Denies Disabled People Meaningful Access to the SSP's Health Services**

The Ordinance discriminates on the basis of disability by reducing, and in some cases eliminating, critical SSP services needed by people with SUD, including the many people with

Pl.'s Mot. for Prelim. Inj. -22
Case No. 3:25-cv-05850-DGE

American Civil Liberties Union
425 California St., 7th Floor, San Francisco, CA 94104
212-549-2500

SUD who also have co-occurring mobility or mental health disabilities. The Ordinance imposes different and greater burdens on disabled people by denying meaningful access to the SSP's health and drug rehabilitation services.

First, by subjecting only SSPs to restrictions on location and distribution of "drug paraphernalia," the Ordinance significantly reduces access to health services required by people with SUD. As discussed above, Gather's SSP provides state-approved, public health services that "cannot be divorced" from people with SUD, including sterile syringes, other public health supplies, and increased access to drug rehabilitation. The mobile ban and geographic restrictions work in tandem to preclude or limit patients' ability to reach the SSP because of barriers stemming from their lack of transportation and symptoms of their SUD. Most of the SSP's patients do not have cars, are unhoused, are scattered throughout the county with little to no available public transportation, and/or fear being stopped by police in route to the SSP. Westergard Decl. ¶¶ 6, 14, 16–18; J.A. Decl. ¶¶ 1, 5–8; J.H. Decl. ¶ 3. Symptoms of SUD compound these barriers by impairing patients' ability to plan, travel, or navigate services systems necessary to reach the SSP. Westergard Decl. ¶¶ 6, 14, 16–18; J.A. Decl. ¶¶ 1, 5–8; J.H. Decl. ¶¶ 1, 3–4. As a result, very few patients who accessed the mobile SSP have been able to travel to Gather's Centralia SSP. Westergard Decl. ¶ 14. The few who do manage to reach the SSP still cannot obtain essential supplies, such as testing kits and as-needed sterile syringes, further increasing the risk of negative health consequences. *Id.* ¶ 18. The Ordinance therefore places "different and greater burdens" on people with SUD, denying them meaningful access to a "clinically-proven and governmentally-approved form of [healthcare]" they require because of their addiction. *Smith-Berch, Inc.*, 68 F. Supp. 2d at 622.

Second, the Ordinance's mobile ban and geographic restrictions impose greater burdens on patients with co-occurring mobility and mental health disabilities who require the mobile clinic as an accommodation to access the SSP. Courts in this circuit have found similar policies that make travel difficult and inconvenient discriminate against disabled people. In *Guerra v. West Los Angeles College*, the Court held that a college's termination of on-campus shuttle

Pl.'s Mot. for Prelim. Inj. -23
Case No. 3:25-cv-05850-DGE

American Civil Liberties Union
425 California St., 7th Floor, San Francisco, CA 94104
212-549-2500

services denied students with mobility disabilities "meaningful access" to campus services by forcing them to walk long distances when their disabilities made walking even short distances difficult and painful. 812 F. App'x 612, 614 (9th Cir. 2020). And in *Labowitz v. Bird Rides, Inc.*, the city violated the ADA by permitting private parties to block pedestrian rights of way with electric vehicles, which compromised disabled pedestrians' access to sidewalks, resulting in injuries, "difficulty, stress, humiliation[,] and frustration." CV-18-9329-MWF, 2020 WL 2334116, at *4 (C.D. Cal. Mar. 31, 2020).

Here, similarly, the Ordinance has further impaired, if not eliminated, access to Gather's SSP for patients with co-occurring mobility and mental health disabilities. These patients relied more heavily on the SSP's mobile clinic, including its ability to visit residential areas and parks because their disabilities make travel difficult, painful, or impossible. Westergard Decl. ¶ 20; J.A. Decl. ¶ 5; J.H. Decl. ¶ 3. Many use wheelchairs, walkers, or canes or walk slowly and with difficulty. J.A. Decl. ¶ 7; Westergard Decl. ¶ 7. Others have mental health disabilities that inhibit their memory and executive functioning, making it more difficult for them to make and execute plans to travel. J.H. Decl. ¶ 3; Westergard Decl. ¶ 7. These disabilities collectively impair, and for some, eliminate their capacity to travel to and from public transportation, let alone to the SSP. The Ordinance's mobile ban and geographic restrictions therefore force these patients to travel long distances and navigate multiple obstacles to reach the Centralia SSP or to forego its services altogether. Westergard Decl. ¶¶ 15–17; J.A. Decl. ¶¶ 5–8; J.H. Decl. ¶¶ 3–4. As a result, even fewer of these patients have since accessed the SSP. Westergard Decl. ¶ 15. The Ordinance therefore places greater burdens on patients with co-occurring mobility and mental health disabilities, denying them meaningful access to the SSP.

The experiences of J.A. and J.H. illustrate how the Ordinance has forced Gather's patients to choose between the pain and difficulty of accessing health services and risking their health. J.A. accessed the mobile clinic weekly to obtain sterile syringes and other supplies. J.A. Decl. ¶ 5. But the symptoms of his SUD and sciatica prevent him from walking to the SSP more than once a month. *Id.* ¶ 7. The symptoms of J.H.'s SUD and mental health disabilities similarly

Pl.'s Mot. for Prelim. Inj. -24
Case No. 3:25-cv-05850-DGE

American Civil Liberties Union
425 California St., 7th Floor, San Francisco, CA 94104
212-549-2500

prevent him from traveling to the SSP more than once a month. J.H. Decl. ¶¶ 3–4. Even when

J.A. and J.H. manage to reach the SSP, they still cannot obtain xylazine and fentanyl test kits,

sterile water, cotton, or safer smoking supplies. J.A. Decl. ¶ 8; J.H. Decl. ¶¶ 4–6. As a result,

they face elevated risk of infection, overdose, and death. If Gather could resume distributing

these supplies through a mobile clinic in and near residential areas and public parks, it could

provide life-saving supplies directly to J.A., J.H., and numerous other patients throughout Lewis

County. Westergard Decl. ¶ 20. But by banning these operations, the Ordinance has denied them

meaningful access to the SSP's health services.

**II. Plaintiffs Are Likely to Succeed On the Merits of their WLAD Claim**

It is well-established that the WLAD "affords to state residents protections wholly

independent of those afforded by the [ADA]." *Hale v. Wellpinit Sch. Dist. No. 49*, 198 P.3d

1021, 1024 (Wash. 2009). The law must be construed liberally for the purpose of remedying

disability discrimination. Wash. Rev. Code § 49.60.020; *Taylor v. Burlington N. R.R. Holdings,*

*Inc.*, 444 P.3d 606, 616 (Wash. 2019). Accordingly, in applying the WLAD, this Court is not

bound by limitations of the ADA, including the exception for current users of illegal drugs. The

WLAD contains "a general civil right" to be free from discrimination because of the presence of

any sensory, mental, or physical disability. Wash. Rev. Code § 49.60.030(1); *see Howell v. Dep't*

*of Soc. & Health Servs.*, 436 P.3d 368, 374 (Wash. Ct. App. 2019). It also creates a separate

right to the "full enjoyment" of any place public accommodation, including a place where

medical service or care is made available. Wash. Rev. Code §§ 49.60.030(1), 040(2). Finally, the

WLAD has been used to invalidate a local ordinance that discriminated based on disability.

*Children's All. v. City of Bellevue*, 950 F. Supp. 1491, 1501 (W.D. Wash. 1997) (holding that a

local ordinance that prohibited the siting of group homes in Bellevue violated federal law and

the WLAD).

The Ordinance violates the WLAD because it prohibits only SSPs from operating a

mobile clinic and distributing public health supplies, thereby singling out and limiting access to

Pl.'s Mot. for Prelim. Inj. -25
Case No. 3:25-cv-05850-DGE

American Civil Liberties Union
425 California St., 7th Floor, San Francisco, CA 94104
212-549-2500

1    health services for people with SUD, mobility disabilities, and mental health disabilities.

2    Therefore, the Ordinance discriminates against disabled people on its face and in its application.

3         Further, the right to "full enjoyment" under the WLAD also prohibits treating some

4    people as "not welcome" or "accepted." Wash. Rev. Code § 49.60.040(14); *see e.g.*, *Segura v.*

5    *United States*, 418 F. Supp. 3d 605, 613 (E.D. Wash. 2019) (upholding a WLAD claim where

6    government actors "directly or indirectly" caused Plaintiff "to be treated as not welcome,

7    accepted, desired, or solicited"). Here, the Ordinance limits access to a lifesaving health service

8    while communicating that people with SUD are not welcome or accepted in Lewis County.

9    **III. Plaintiff Is Likely to Succeed on the Merits of Its State Law Preemption Claims**

10        The Ordinance's supplies ban violates the Washington State Constitution because it is

11   contrary to state law. "A local regulation conflicts with a statute when it . . . prohibits what state

12   law permits." *Ent. Indus. Coal. v. Tacoma-Pierce Cnty. Health Dep't*, 105 P.3d 985, 987 (Wash.

13   2005).

14        Since 1992, the Washington Supreme Court has recognized that SSPs are exempt from

15   state criminal laws that otherwise ban distribution of drug paraphernalia, recognizing that

16   "abundant evidence" supports "the efficacy of needle exchange programs," including a

17   "significant reduction in discarded needles," "no increase in the number of [intravenous drug

18   users] or in the frequency of injection," and an increase of individuals entering drug treatment

19   "as a direct result" of SSPs. *Spokane Cnty. Health Dist. v. Brockett*, 839 P.2d 324, 326–27

20   (Wash. 1992). Washington's drug paraphernalia statute codifies this holding, granting public

21   health programs like Gather permission to distribute "public health supplies including, but not

22   limited to, syringe equipment, smoking equipment, or drug testing equipment." Wash. Rev.

23   Code § 69.50.4121(3).

24        The Ordinance is preempted because it imposes civil and criminal penalties for the

25   distribution of these very supplies. In *Ent. Indus. Coal*, the Washington Supreme Court found a

26   local health board's resolution prohibiting all indoor smoking was pre-empted by state law that

27   read: "A smoking area may be designated in a public place." 105 P.3d at 987. "The resolution,

American Civil Liberties Union
425 California St., 7th Floor, San Francisco, CA 94104
212-549-2500

by imposing a complete smoking ban, prohibits what is permitted by state law: the ability of certain business owners and lessees to designate smoking and nonsmoking locations in their establishments." *Id.* at 988.

Here, the Ordinance presents a more direct conflict because the state legislature has decided to exempt the distribution of public health supplies from the definition of criminalized drug paraphernalia. Wash. Rev. Code § 69.50.4121(3). Under state law, Gather may distribute fentanyl and xylazine test strips, sterile supplies, and safer smoking supplies. Indeed, Gather is partially funded by the Health Department for that purpose. Meckle Decl. ¶ 45; Urs Decl., Ex. A. Therefore, the Ordinance conflicts with state law because it prohibits precisely what the state law explicitly permits.

This conflict is not resolved by the state law exception permitting county "ordinances relating to the establishment or regulation of harm reduction services concerning drug paraphernalia." Wash. Rev. Code § 69.50.612(2). This authorization does not apply where, as here, the county ordinance is "inconsistent with, more restrictive than, or exceed[s] the requirements of state law." Wash. Rev. Code § 69.50.612(1); *see Cannabis Action Coal. v. City of Kent*, 351 P.3d 151, 154–55 (Wash. 2015) (recognizing that statutory language expressly contemplating local regulation creates a defense to field preemption but not conflict preemption).

**IV. Plaintiff and Its Patients Face Irreparable Harm Absent Preliminary Relief**

Without preliminary relief, Gather and its patients face two forms of irreparable harm. First, the Ninth Circuit presumes irreparable harm where, as here, there is a violation of a federal civil rights statute. *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001). Because Plaintiff is likely to succeed on the merits of its ADA and Section 504 claims, it has established irreparable harm.

Second, Gather's patients face irreparable harm based on their risk of likely infection, disease transmission, and overdose from sharing contaminated syringes and their inability to access xylazine and fentanyl test strips and other prohibited products. A preliminary injunction

American Civil Liberties Union
425 California St., 7th Floor, San Francisco, CA 94104
212-549-2500

is appropriate here because these immediate and unmeasurable injuries to public health cannot be compensated through monetary damages. *Rodde*, 357 F.3d at 999 (hospital closure would impose irreparable harm by delaying or eliminating "necessary treatment" and "increas[ing] pain and medical complications"); *Immigrant Legal Res. Ctr. v. City of McFarland*, 472 F. Supp. 3d 779, 785 (E.D. Cal. 2020) (enjoining city from transferring detainees to reduce "unnecessary risks to public health" from possible COVID-19 transmission).

Here, similarly, the Ordinance has already delayed and, for some, eliminated access to life saving supplies. Westergard Decl. ¶¶ 14–18; J.A. Decl. ¶¶ 8–10; J.H. Decl. ¶¶ 4–6. Some of Gather's SSP patients have died of overdose. Westergard Decl. ¶ 16. People with SUD have also lost access to the continuum of care facilitated by these services, including wound care, emergency services transport, and treatment for SUD, increasing their risk of infection, disease transmission, and overdose. Bluthenthal Decl. ¶¶ 76–81; Westergard Decl. ¶ 19. The larger community also faces increased risk of disease transmission. Bluthenthal Decl. ¶¶ 78, 80. Forcing Gather's patients to incur these harms before seeking relief would undermine the purpose of a preliminary injunction—to prevent irreparable harm before it occurs.

Third, the Ordinance prevents Gather from fulfilling its religious mission of serving the most vulnerable members of its community. Without the ability to operate its mobile clinic and distribute lifesaving health supplies, Gather must sit idly by and watch its community members suffer as a result, causing irreparable harm. The Ordinance's employment restrictions further prevent Gather from exercising its religion by providing much needed employment and career development to people in recovery.

## V. The Balance of Equities and Public Interest Weigh in Favor of Granting Preliminary Relief

Gather and its patients will suffer irreparable harm absent preliminary relief while the County will suffer none. As discussed above, the Ordinance bans services that facilitated access to SUD treatment and health care, prevented overdose and disease transmission, and offered services promoting stable employment and housing. *See* Urs Decl., Ex. A. The resulting threat

to the health of Gather's patients and the larger community weigh heavily in favor of an injunction.

The County lacks any countervailing interest in causing "preventable human suffering." *Rodde*, 357 F.3d at 999. By denying access to supplies that present no danger to the community, the Ordinance thwarts rather than advances the County's purported public health objectives—reducing drug addiction, infection, and crime. Bluthenthal Decl. ¶¶ 44–68; Pugel Decl. ¶¶ 33–43. Moreover, the "public's strong interest [lies] in the rule of law being applied uniformly and consistently," *Idaho Org. of Res. Councils v. Labrador*, 780 F. Supp. 3d 1013, 1046 (D. Idaho 2025), and in a manner that advances public health, *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018). Because there is no conceivable public health justification to deny Gather's patients access to these supplies, the balance of hardship tips decidedly in Plaintiff's favor.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's Motion for a Preliminary Injunction.

\*\*\*

The undersigned certifies that this motion contains 8,399 words, in compliance with the Local Civil Rules.

Dated: October 14, 2025

By: /s/ Tara Urs
Tara Urs (Bar No. 48335)
turs@aclu-wa.org
La Rond Baker (Bar No. 43610)
LBaker@aclu-wa.org
ACLU Foundation of Washington
P.O. Box 2728
Seattle, WA 98111

Joseph Longley*
jlongley@aclu.org
AMERICAN CIVIL LIBERTIES UNION
915 15th St NW, Seventh Floor
Washington, D.C., 20001

/s/ Malhar Shah
Malhar Shah*
mshah@aclu.org
Zoe Brennan-Krohn*
zbrennan-krohn@aclu.org
AMERICAN CIVIL LIBERTIES UNION
425 California St., 7th Floor
San Francisco, CA 94104

David Howard Sinkman*
sinkman@kaplangrady.com
Amelia Caramadre*
amelia@kaplangrady.com
Sarah Grady*
sarah@kaplangrady.com
KAPLAN & GRADY LLC
2071 N. Southport Ave., Ste. 205

Pl.'s Mot. for Prelim. Inj. -29
Case No. 3:25-cv-05850-DGE

American Civil Liberties Union
425 California St., 7th Floor, San Francisco, CA 94104
212-549-2500

Chicago, Illinois 60614

*Admitted pro hac vice*

Pl.'s Mot. for Prelim. Inj. -30
Case No. 3:25-cv-05850-DGE

American Civil Liberties Union
425 California St., 7th Floor, San Francisco, CA 94104
212-549-2500