1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10

11   GATHER CHURCH,                          CASE NO. 3:25-cv-05850-DGE

                        Plaintiff,           ORDER GRANTING MOTION
12        v.                                 FOR PRELIMINARY INJUNCTION
                                             (DKT. NO. 25)
13   LEWIS COUNTY et al.,

14                      Defendants.

15

16        Plaintiff Gather Church is a religious organization located in Lewis County, Washington.

17   (Dkt. No. 1 at 2.)  Plaintiff commenced this action against Defendants,[1] alleging they violated

18   federal and state law by enacting an ordinance that discriminates based on disability and

19   infringes on Plaintiff's religious exercise by limiting its ability to conduct a mobile sterile

20   syringe program servicing disabled individuals.  (*Id.* at 1, 30–39.)  Before the Court is Plaintiff's

21

22   _____

     [1] Defendants include Lewis County; Sean Swope as Lewis County Commissioner; Lindsey
23   Pollock as Lewis County Commissioner; Scott Brummer as Lewis County Commissioner;
     Robert Snaza as Lewis County Sheriff; and Meja Handlen as Director of Lewis County Public
24   Health and Social Services.

1  motion for a preliminary injunction.  (Dkt. No. 25.)  For the reasons set forth below, Plaintiff's

2  motion for a preliminary injunction is GRANTED.

3                              **I        BACKGROUND**

4    **A.  Plaintiff**

5        In 2010, Plaintiff opened as a religious organization "dedicated to serving God by caring

6  for vulnerable members of Lewis County."  (Dkt. No. 25-2 at 3.)  For it, "an essential part of

7  worshipping God includes serving the most vulnerable members of [its] community (the widow,

8  orphan, and stranger among us)."  (*Id*. at 2.)  To this end, Plaintiff began providing "wraparound

9  health and support services to help vulnerable members of Lewis County, with a particular focus

10  on residents with substance use disorder ('SUD')."  (*Id*. at 3.)  One component of Plaintiff's

11  wraparound services includes the Medication for Addiction Treatment Program ("MAT Clinic").

12  (*Id.* at 4.)  The MAT clinic offers buprenorphine for individuals, as well as primary medical care,

13  testing for HIV and Hepatitis C, and mental health counseling.  (*Id.*)  Plaintiff's lead pastor and

14  chief executive officer Pastor Cole Meckle stated that Plaintiff planned to launch a mobile clinic

15  in November 2025 that would "provide MAT, primary care, and testing for HIV and Hepatitis C

16  for people who cannot reach our Centralia location."  (*Id.* at 2, 5.)

17        In 2019, Plaintiff received a grant from the Washington State Department of Health

18  ("DOH") to launch the "first and only Syringe Services Program ("SSP") in Lewis County."  (*Id.*

19  at 6.)  Plaintiff provided a copy of its most current SSP grant contract.  (*Id*. at 26–58.)  Among

20  other things, the DOH contract requires Plaintiff to report on identifiable

21  "Deliverables/Outcomes" (*id*. at 29–30); to "submit monthly SSP data in accordance with DOH

22  standards" (*id*. at 32); to "submit monthly outcome data in accordance with DOH standards"

23  (*id*.); to "participate in program evaluation activities, including evaluation planning, and

24

collecting and reporting qualitative and quantitative program data" (*id*. at 34); to participate in "Program Monitoring Activities" (*id*.); and to ensure its staff is properly trained in a variety of areas (*see generally id*. at 31–40).  Plaintiff confirmed the most current DOH contract is a renewal of its original DOH contract.  (Dkt. No. 62 at 50.)

Plaintiff's SSP provided sterile items such as needles, water, cotton filters, and "cookers,"[2] as well as naloxone and test kits for fentanyl and xylazine.  (*Id*. at 7.)  The SSP provided needles on an as-needed basis to prevent the risk of infection and transmission of diseases.  (*Id*.)  Plaintiff operated its SSP "primarily through a mobile clinic" which would make regular weekly visits to homeless encampments and served "an average of 400 individuals each month, distributing more than 20,000 sterile syringes each month."  (*Id*. at 7–8.)  The SSP "facilitated access" to the MAT Clinic, with an average of six patients per month entering treatment based on a referral from the SSP.  (*Id*. at 8.)  Marvin Westergard, a Harm Reduction Navigator for Plaintiff, testified, "Almost all of our SSP patients were forced to use our mobile clinic because they did not have transportation and/or their SUD, mobility disabilities, or mental disabilities prevented them from reaching our fixed-location SSP in Centralia."  (Dkt. No. 25-3 at 2–3.)  This includes individuals who use wheelchairs, walkers, or canes, as well as those who had "noticeable mental health disabilities."  (*Id*. at 4.)

In September 2023, the Washington State Department of Transportation "cleared one of the homeless encampments in Centralia that the mobile clinic frequently visited and blocked access to the site, cutting off a key access point to care for many of" Plaintiff's mobile SSP patients.  (Dkt. No. 25-2 at 9.)  The encampment sweep "forced many of [Plaintiff's] mobile SSP patients to move to smaller encampments," and Pastor Meckle temporarily stopped operating the

---

[2] Pastor Meckle identified a "cooker" as a bottle-cap sized metal cup.  (Dkt. No. 25-2 at 7.)

mobile SSP to locate the displaced patients and plan how to travel to the new dispersed locations. (*Id.*)  However, Plaintiff's staff continued to travel on foot to local encampments to distribute syringes and other supplies.  (*Id.*)  Before Plaintiff could resume its mobile SSP clinic, Lewis County passed an ordinance that restricted how Plaintiff could operate its SSP.  (*Id.*)

### B.  The Ordinance

On April 16, 2024, Lewis County adopted Ordinance 1354 ("the Ordinance") "to ensure sterile needle and syringe exchange programs operating in Lewis County operate in the safest manner in all aspects and balance the priority of users' safety and users' drug treatment, sobriety, and abstinence."  Lewis County Code § 8.80.010(2).  The Ordinance acknowledges that SSPs offer "means to reduce the transmission of HIV, AIDS, viral hepatitis, or other blood-borne diseases," help reduce "a serious risk to public health" caused by improperly disposed needles and syringes, and "provide a first point of contact for formal drug treatment, access to health and counseling service referrals."  *Id*.

Relevant here, however, the Ordinance restricts who may work at an SSP, the quantity of needles an individual may exchange, and the location of SSPs.  All staff, volunteers, and other individuals working with the program could not have been a participant of an SSP or convicted of a drug related offense in the past 24 months.  *Id.* § 8.80.040.  The program operator of the SSP "shall operate a one-to-one exchange, whereby a participant shall receive one sterile needle and syringe unit in exchange for each one used."  *Id.* § 8.80.050.  "No other drug paraphernalia shall be issued or distributed in any manner."  *Id.*  As to the location of SSPs, the Ordinance restricted the locations to those which are not exclusively zoned for residential purposes and not within 750 feet of a school, library, or public park.  *Id.* § 8.80.110(2)–(3).  The Ordinance further

1   restricted mobile exchanges from operating, and instead required fixed locations.[3]  *Id.*

2   § 8.80.110(1).  Any program operator found in violation of any portion of the Ordinance is

3   subject to civil penalties.  *Id.* § 8.80.160.  A third violation, and all subsequent violations of the

4   Ordinance shall be a misdemeanor.  *Id.*

5           Local law enforcement supported the passage of the Ordinance.  Sheriff Snaza

6   participated "in the public comment proceedings [of the passage of the Ordinance] because [he]

7   believe[d] that without accountability and oversight, [Plaintiff's] SSP was having a negative

8   effect on the health and safety of the county."  (Dkt. No. 44 at 4.)  These negative effects

9   included "issues with large groups of intravenous drug users creating unsafe and unsanitary

10  conditions throughout the country."  (*Id.* at 3.)  These individuals were unhoused and would

11  "gather in encampments where they would live and use drugs together."  (*Id.*)  One such

12  encampment was known as Blakeslee Junction, and Plaintiff would operate its mobile SSP there.

13  (*Id.* at 3–4.)  Sheriff Snaza stated the individuals living in Blakeslee lived in "unimaginable

14  conditions," as there was an exorbitant amount of drug paraphernalia, including needles,

15  smoking supplies, and raw sewage in the area.  (*Id.* at 4.)  Sheriff Snaza became concerned when

16  he learned about Plaintiff's proposed expansion of its mobile SSP, as he believed instances of

17  reported drug use increased exponentially in the areas where Plaintiff operated its SSP.  (*Id.*)

18  Sheriff Snaza reported that since the passage of the Ordinance, criminal complaints had

19  drastically reduced, and "[t]he county has been able to redirect resources which had previously

20  been used to address issues in the areas where [Plaintiff] was operating its SSP."  (*Id.*)  Centralia

21

22  ───────────────────
    [3] However, "[a]ny program operator conducting a mobile exchange in Lewis County using a
23  mobile vehicle at the time this chapter is enacted may continue until December 31, 2025, to use
    the mobile vehicle for the operation of its needle and hypodermic syringe exchange" so long as
24  the program follows certain guidelines.  Lewis County Code § 8.80.110(1)(a).

Police Commander David Clary stated prior to the Ordinance, certain areas of the city became "more attractive to active drug users, and it was making drug use more accessible."  (Dkt. No. 46 at 1–2.)

Centralia Police Officer Michael Barela described the "many negative experiences with the effects of having a mobile needle exchange in [his] community," such as the prevalence of needles in public spaces and the congregation of those in possession of drugs and needles in public spaces such as parks and transit stations.  (Dkt. No. 47 at 2–3.)  In Officer Barela's experience, "these gathering places where [Plaintiff] would previously operate its needle exchange and wherever it did so, it seemed that the problems associated with needle litter and drug related crimes would increase."  (*Id.* at 3.)  Officer Barela stated that the passage of the Ordinance led to a decrease in the number of needles in the community, as well as a decrease in overdose deaths.  (*Id.*)  Centralia Police Officer Andy Caldwell described the "noticeable problem with needle and drug paraphernalia litter in public spaces" before the Ordinance was enacted, and explained that after the Ordinance went into effect, he had experiences walking through public spaces "where [he] would have expected to find used needles . . .  and [he] did not discover any discarded syringes."  (Dkt. No. 49 at 2–3.)

### C.  Plaintiff Post-Ordinance

To comply with the Ordinance, Plaintiff keeps its mobile clinic parked outside their MAT clinic in Centralia, Washington.  (Dkt. No. 25-3 at 6.)  Westergard testified he knew of at least 20 mobile SSP patients "who have never visited [the] Centralia SSP since [Plaintiff] stopped operating the mobile clinic."  (Dkt. No. 25-3 at 6.)  Westergard further stated former patients expressed to him that "they want to access our fixed location SSP in Centralia, but that they

1   cannot reach us because they do not have transportation and/or their disabilities prevent them

2   from traveling." (*Id.* at 7.)

3       Plaintiff also provided two declarations from its SSP patients.  Declarant J.H. is a patient

4   who faces addiction and utilizes Plaintiff's SSP.  (Dkt. No. 25-4 at 2.)  J.H. began utilizing the

5   SSP at Plaintiff's main clinic in January 2024 to exchange used syringes and pick up test kits and

6   other sterile items.  (*Id.*)  J.H. stated that in April 2024, the clinic stopped giving out test kits,

7   sterile water, cotton, and "as many syringes as [he] needed."  (*Id.*)  J.H. stated, "I heard that it

8   used to drive around Centralia to give out these supplies but that it stopped doing that. . . These

9   new rules make it hard for me to get the supplies that I need to be safe."  (*Id.*)  J.H. stated he has

10  mental health disabilities that make it difficult for him to remember to go to the SSP during

11  opening hours.  (*Id.*)  J.H. is "rarely" able to use Plaintiff's SSP services, and because he is

12  required to exchange on used needle for one clean needle, he runs out of clean needles and is

13  forced to either reuse or share old needles.  (*Id.* at 3.)

14      Declarant J.A. has utilized Plaintiff's SSP for the past three years to obtain "sterile

15  syringes, fentanyl test kits, cotton, and sterile water." (Dkt. No. 25-5 at 2.)  Before April 2024,

16  J.A. accessed the SSP through Plaintiff's mobile clinic which regularly stopped near a residential

17  neighborhood close to J.A.'s home.[4]  (*Id.*)  After April 2024, the mobile clinic no longer came to

18  the location near J.A.'s home and is now one and a half miles away from his home.  (*Id.* at 3.)

19  J.A.'s addiction makes it difficult for him to make plans, and his sciatica makes it difficult for

20  J.A. to access the SSP.  (*Id.*)  J.A. stated, "Because the clinic is so far away, I now have to travel

21

22  _____

    [4] Defendants question the veracity of J.A.'s declaration as Defendants assert that Plaintiff
    stopped its mobile delivery in September 2023.  (Dkt. No. 42 at 15; *see also* Dkt. No. 25-2 at 9.)
23  However, Plaintiff identifies that its staff continued to travel on foot "to local encampments to
    offer sterile syringes and other supplies as [it] reassessed how [it could] most effectively
24  continue [its] SSP work."  (Dkt. No. 25-2 at 9.)

a long distance with used syringes to get to the clinic.  This is very uncomfortable, and makes me nervous that I will get harassed."  (*Id.*)

### D.  Procedural History

On September 22, 2025, Plaintiff filed its complaint against Defendants and asserted five causes of action for violations of: Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*; § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; Article I, Section 11 and Article XI, Section 11 of the Washington Constitution; and Washington Law Against Discrimination ("WLAD").  (Dkt. No. 1 at 30–39.)  On October 14, 2025, Plaintiff filed a motion for a preliminary injunction to enjoin Defendants from enforcing the Ordinance.  (Dkt. No. 25.) The motion is based on their ADA claim (First Cause of Action), Section 504 claim (Second Cause of Action), Preemption claim (Fourth Cause of Action), and WLAD claim (Fifth Cause of Action.)  (*Id.*)

## II      JUSTICIABILITY

Article III of the Constitution empowers the federal courts to decide only "live cases or controversies;" a court may not "issue advisory opinions [or] declare rights in hypothetical cases."  *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000). "From this bedrock constitutional principle, two related justiciability doctrines flow:" standing and ripeness.  *Nat'l Shooting Sports Found. v. Bonta*, 718 F. Supp. 3d 1244, 1249 (S.D. Cal. 2024).

### A.  Procedural Background

In its motion for preliminary injunction, Plaintiff argued that "drug rehabilitation clinics can challenge statutes that discriminate against their disabled patients," because the ADA and Section 504 allow its remedies to be enforced by any person alleging discrimination based on a

disability.  (Dkt. No. 25 at 16.)  However, Plaintiff stated it asserted "discrimination on behalf of its patients, who have disabilities for purposes of the ADA and Section 504."  (*Id.*)  In response to this sentence, Defendants argued that Plaintiff had failed to establish associational standing.[5] (Dkt. No. 42 at 9–19.)  In its reply brief, Plaintiff clarified that Defendants incorrectly assumed Plaintiff invoked associational standing, when Plaintiff's standing instead arose from associational discrimination.  (Dkt. No. 52 at 8.)  At oral argument, Defendants stated they did not require additional briefing to address this new standing argument.  (Dkt. No. 62 at 79.)  Thus, the Court will analyze whether Plaintiff has sufficiently asserted an associational discrimination claim under Title II of the ADA—i.e., that Plaintiff itself was injured because of its association with the disabled population it serves.

### B.  Analysis

To establish standing, Plaintiff must show it suffered an injury in fact that is concrete, particularized, and actual or imminent; fairly traceable to the challenged conduct of the defendant; and likely redressable by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992).  Standing is a threshold inquiry in every federal case, and it involves an inquiry into whether "a plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant [their] invocation of federal-court jurisdiction to justify exercise of the court's remedial powers on [their] behalf."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (citations and quotation marks omitted).  Aside from the minimal standing requirements under Article III, however, prudential considerations may bar a person or entity from asserting standing on behalf

---

[5] An entity possesses standing to sue on its members' behalf when it can satisfy the following three elements: (1) that its members otherwise would have standing to sue in their own right, (2) that the interests at stake prove germane to the entity's purpose, and (3) that neither the claim asserted nor the relief requested requires the participation of the individual members in the suit. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

of the rights of others. *Id.* at 500–501. But prudential barriers do not apply in all cases; "Congress may grant an express right of action to persons who would otherwise be barred." *Id.* at 501. An entity may sue in its own right for injuries sustained as a result of a defendant's actions, without prudential standing concerns, where Congress has provided the entity such a right. *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 333 (6th Cir. 2002).

Title II of the ADA states that "no qualified individual with a disability shall, by reasons of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. However, the ADA's public entity enforcement provision states that the statute extends its remedies to "any person alleging discrimination on the basis of disability," 42 U.S.C. § 12133, and the Rehabilitation Act protects "any person aggrieved" by the discrimination of a person based on their disability, 29 U.S.C. § 794a(a)(2). "[S]uch broad language in the enforcement provisions of the statutes evinces a congressional intention to define standing to bring a private action . . . as broadly as is permitted by Article III of the Constitution." *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 47 (2d Cir. 1997) *recognized as superseded on other grounds by Zervos v. Verizon N.Y.*, Inc., 252 F.3d 163, 171 n.7 (2d Cir. 2001).

The Second Circuit has expressly contemplated suits by non-disabled plaintiffs for discrimination because of the plaintiff's association with disabled individuals. In *Innovative Health Sys., Inc.*, the plaintiff (hereinafter "IHS"), an outpatient drug and alcohol rehabilitation treatment center, sought a building permit to relocate its treatment center. 117 F.3d at 40. After more than a year of trying to obtain the permit, IHS's application was ultimately denied. *Id.* IHS, along with five of its clients, sued the City of White Plains and others claiming that the

decision to revoke IHS's permit was discriminatory. *Id.* at 42. The City argued IHS lacked

standing to bring the suit under the ADA. *Id.* On appeal, the Second Circuit held IHS had

standing under Title II of the ADA. *Id.* at 47. The panel indicated that "the use of such broad

language in the enforcement provisions of the statutes 'evinces a congressional intention to

define standing to bring a private action under [section 504 of the Rehabilitation Act] [and Title

II of the ADA] as broadly as is permitted by Article III of the Constitution.'" *Id.* (second

alteration in original) (quoting *Innovative Health Sys., Inc. v. City of White Plains*, 931 F.Supp.

222, 237 (S.D.N.Y.1996), *aff'd*, 117 F.3d 37 (2d Cir.1997)).

In *MX Group*, the Sixth Circuit adopted the Second Circuit's reasoning regarding

whether an entity could sue under Title II of the ADA. 293 F.3d at 335. The Sixth Circuit noted

that the Department of Justice was granted the authority to formulate regulations to implement

Title II of the ADA and that it followed congressional intent by doing so. *Id.* at 334. The Sixth

Circuit also indicated that "the appendix to [28 C.F.R. § 35.130] explain[s] that 'the individuals

covered under this paragraph are any individuals who are discriminated against because of their

known association with an individual with a disability.'" *Id.* (quoting 28 C.F.R. § 35.130, app. A

at 544).

The Ninth Circuit has not yet addressed associational discriminations claim under Title II

of the ADA but district courts throughout the circuit appear to be in consensus that a plaintiff

may bring an associational discrimination claim if the plaintiff has suffered an injury

independent of the injury suffered by their disabled associate. *See, e.g., Glass v. Hillsboro Sch.

Dist. 1J*, 142 F. Supp. 2d 1286, 1288 (D. Or. 2001); *Cortez v. City of Porterville*, 5 F. Supp. 3d

1160, 1164–66 & n.2 (E.D. Cal. 2014). Here, Plaintiff contends that "the Ordinance prevents [it]

from fulfilling its religious mission of serving the most vulnerable members of its community."

(Dkt. No. 25 at 28.)  Thus, Plaintiff meets the constitutional standing requirements of injury in fact and causation, and redressability, as Plaintiff seeks to invalidate the Ordinance.  (*See* Dkt. No. 1 at 39.)  The Court is satisfied that Plaintiff has alleged an injury independent from the injuries suffered by their disabled patients and concludes that Plaintiff has standing to assert its associational discrimination claim under the ADA and Section 504.

Regarding standing under the WLAD, as discussed below, Washington interprets the WLAD broader than the ADA.  Thus, for the same reasons Plaintiff has standing to assert its claim under the ADA and Section 504, so too does it have standing to assert a claim under WLAD.

Regarding Plaintiff's preemption claim, the Court concludes Plaintiff has alleged sufficient standing.  Washington Revised Code § 69.50.4121(3) allows "distribution or use of public health supplies including, but not limited to, syringe equipment, smoking equipment, or drug testing equipment, through public health programs."  As a result of the Ordinance, Plaintiff is currently prohibited from distributing syringe equipment and drug testing equipment.  Thus, Plaintiff has asserted an injury traceable to Defendants that could be redressed by enjoining the Ordinance.

### III    LEGAL STANDARD

Governed by Federal Rule of Civil Procedure 65(a), a "preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. NRDC*, 555 U.S. 7, 24 (2008).  To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id*. at 20.  "In each case, courts 'must balance the competing claims of injury and must consider the effect

on each party of the granting or withholding of the requested relief.'"  *Id.* at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987)).  In so doing, a court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Id.* (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).  The Ninth Circuit has adopted a sliding scale test for preliminary injunctions in which "a stronger showing of one element may offset a weaker showing of another."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  Thus, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Id.* at 1135 (internal quotations removed).

## IV     ANALYSIS

### A.  Likelihood of Success on the Merits

#### 1.  ADA and Section 504 of the Rehabilitation Act[6]

To establish a violation of the ADA, a plaintiff must demonstrate they are (1) a qualified individual with a disability, (2) either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of their disability.  *Rodde v. Bonta*, 357 F.3d 988, 995 (9th Cir. 2004) (quoting *Weinreich v. Los Angeles Cnty. MTA*, 114 F.3d 976, 978 (9th Cir. 1997) (emphasis omitted)).

   a.  *Qualified individual with a disability*

---

[6] Congress has instructed that the ADA is to be interpreted consistently with the Rehabilitation Act, *see Armstrong v. Wilson*, 124 F.3d 1019, 1023 (9th Cir. 1997); *cf. Collings v. Longview Fibre Co.*, 63 F.3d 828, 832 n.3 (9th Cir. 1995) (noting that "Congress intended judicial interpretation of the Rehabilitation Act be incorporated by reference when interpreting the ADA").

An individual is considered disabled under the ADA if "a physical or mental impairment . . . substantially limits one or more major life activities" of the individual.  42 U.S.C. § 12102(1)(A).  Plaintiff states their patients have disabilities including "SUD, ADHD [attention deficit hyperactivity disorder], traumatic brain injury, sciatica, and other mobility and mental health impairments that substantially limit their major life activities." (Dkt. No. 25 at 16.)  "[T]he term 'individual with a disability' does not include an individual who is currently engaging in the illegal use of drugs." 42 U.S.C. § 12210(a).  However, "[n]otwithstanding subsection (a) and section 12211(b)(3) of this title, an individual shall not be denied *health services*, or *services provided in connection with drug rehabilitation*, on the basis of the current illegal use of drugs if the individual is otherwise entitled to such services." 42 U.S.C. § 12210(c) (emphasis added).  The Parties disagree as to whether Plaintiff's mobile SSP provides a health service or services in connection with drug rehabilitation.

In support of its preliminary injunction, Plaintiff filed a letter from Washington State Health Officer Tao Sheng Kwan-Gett of the DOH.  (Dkt. No. 25-6 at 2, 4.)  Dr. Kwan-Gett stated SSPs are "an essential component to a comprehensive response to addressing substance use, the overdose crisis, and preventing infectious diseases." (*Id.* at 4.)  Furthermore, the programs provide "a range of services critical to protecting and improving the health of Washington state communities," and research shows that "users of SSPs are five times more likely to enter drug treatment and about three times more likely to stop using drugs than those who do not use the programs." (*Id.*)  Dr. Kwan-Gett also attached three publicly available reports representing DOH's position on SSPs.  (*Id.*)  These reports emphasize the benefits of SSPs; the programs, for example, offer screening for infectious diseases, provide HIV prevention intervention, and provide referrals to physical and behavioral health care.  Wash. State Dep't of

Health, *SSPs Benefit Communities and Public Health* (Mar. 2019),

https://doh.wa.gov/sites/default/files/legacy/Documents/Pubs/150-123-SSPcommunity.pdf.  The

second report states that SSPs "have been a cornerstone of the public health response to HIV and

other substance use-related health conditions, including hepatitis B, hepatitis C, endocarditis, and

skin and soft tissue infections."  Wash. State. Dep't of Health, *The Essential Role of Syringe*

*Services Programs in Preventing Overdose Deaths* (Nov. 2024),

https://doh.wa.gov/sites/default/files/2024-11/150297-RoleSSPsInOverdoseResponse.pdf.  The

final report noted that before SSPs were authorized in the United States, "HIV seroprevalence

among people who injected drugs was climbing, and at the time of SSP implementation in

Washington State, nearly three-quarters of new HIV infections were attributable to injection drug

use.  Today, between five and ten percent of new HIV infections in Washington State are related

to injection drug use."  Wash. State Dep't of Health, *Recommendation Needs-Based Syringe*

*Access* (2019), https://doh.wa.gov/sites/default/files/legacy/Documents/Pubs/150-122-

WADOHSyringeAccessRecommendation2019.pdf.

Plaintiff also submitted a declaration from Dr. Ricky Bluthenthal, a sociologist who

studies the impact of SSPs "on the health and well-being of people who use illegal drugs and the

wider community."  (Dkt. No. 25-7 at 2.)  Dr. Blunthenthal opined that the opioid epidemic has

led not only to the public health problem of overdose deaths, but also was "closely linked to

increased HIV transmission," as well as other infectious diseases.  (*Id.* at 9-11.)  The primary

goal of SSPs is "to reduce the negative health consequences of illegal drug use, including spread

of infectious diseases . . . while also connecting people with drug addiction treatment."  (*Id.* at

12.)  Research shows that SSPs reduce the risk of HIV and Hepatitis transmission by 50 percent

or more.  (*Id.* at 13.)  This is done by distributing public health supplies that reduce the risk of

disease transmission, such as "sterile water, cotton, cookers, and other materials used to prepare

drugs for injection," as these materials decrease exposure to blood-borne diseases obtained from

sharing the materials.  (*Id.* at 15.)

Lewis County itself acknowledges that SSPs offer "means to reduce the transmission of

HIV, AIDS, viral hepatitis, or other blood-borne diseases," help reduce "a serious risk to public

health" caused by improperly disposed needles and syringes, and "provide a first point of contact

for formal drug treatment, access to health and counseling service referrals."  Lewis County

Code § 8.80.010(2).

Considering the DOH public reports, Dr. Bluthenthal declaration, and Lewis County's

own acknowledgment about SSPs, the evidence supports classifying Plaintiff's mobile SSP as a

health service.

In response, Defendants submitted a declaration from Dr. Melissa Caldwell, a clinical

and forensic psychologist.  (Dkt. No. 45.)  Dr. Caldwell explained the distinction between

"regulated needle exchanges," which she considers health services, and "unregulated needle

exchanges," which she does not consider as a health service; regulated needle exchanges are

"embedded within a clinical or public health services," and "operate[] under standards for

assessment, referral, waste disposal, data tracking, and professional oversight."  (*Id.* at 9.)  In

contrast, unregulated needle exchanges operate "[w]ithout consistent clinical assessment, without

documentation requirements, without professional training standards, and without the

infrastructure needed for infectious disease control, overdose prevention, or safe disposal."  (*Id.*)

However, Pastor Meckle declared that Plaintiff's SSP "is a structured, data-driven health

intervention operating within local, state, and federal law, guidance, and privacy requirements."

(Dkt. No. 53 at 3.)  For example, the SSP follows DOH guidance, and the mobile unit

"documented the number of syringes distributed, medical supplies distributed, syringes collected, wound care encounters, patients/new patients engaged, and many other pieces." (*Id.* at 3–4.) Plaintiff coordinated with the DOH monthly "to ensure that [the] SSP was operating according to the highest standards," including submitting monthly reports "regarding number of treatment referrals made to and from our mobile SSP, among other data." (*Id*. at 4.) Staff also are trained in "safe collecting, exchanging, and disposing of used syringes" and various other areas related to operating an SSP in a controlled manner. (*Id*.) The mobile unit further "conducted health assessments, provided mental health care and peer services, provided wound care, and made referrals to treatment and other services." (*Id.* at 7.) Additionally, the SSP facilitated access to Plaintiff's MAT clinic. (Dkt. No. 25-2 at 9.) Pastor Meckle's description of how Plaintiff's SSP program is regulated, including the mobile program, is supported by the DOH contract requirements. (*See* Dkt. No. 25-2 at 26–58.) Using Dr. Caldwell's own opinion as to what qualifies as a regulated needle exchange program, the record establishes Plaintiff was and is conducting a regulated needle exchange and thus providing health services or services in connection with drug rehabilitation.[7]

### b.  Denied the benefit of services, programs, or activities

Under the regulations, a public entity, "in providing any aid, benefit, or service may not . . . [d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service" or "[o]therwise limit [such an individual] in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or

---

[7] Though Defendants disagree with this conclusion, Defendants' counsel acknowledged at the December 4, 2025 hearing that, at a minimum, there was a serious question going to the merits as to whether the SSPs are health services or services related to drug rehabilitation. (Dkt. No. 62 at 36.)

1  service." 28 C.F.R. § 35.130(b)(1)(i), (vii).  Furthermore, the regulations prohibit a public entity

2  from "utiliz[ing] criteria or methods of administration . . . [t]hat have the effect of subjecting

3  qualified individuals with disabilities to discrimination on the basis of disability." *Id.*

4  § 35.130(b)(3)(i).

5      As discussed above, Plaintiff has presented evidence that its SSPs are a health service

6  under § 12210(c).  Plaintiff has also presented evidence that it was altogether foreclosed from

7  operating its mobile SSP, from distributing needles on an as-needed basis, and from distributing

8  drug test kits as a whole because of the health services it offered to its patients.  Thus, Plaintiff

9  has established its clients are being denied the health services Plaintiff provides through its SSP.

10          *c.   Discrimination was by reason of disability*

11      Defendants argue that Plaintiff must show it was discriminated against "'solely by reason

12  of [its] disability.'"  (Dkt. No. 42 at 24 (quoting *Halpern v. Wake Forest Univ. Health Scis.*, 669

13  F.3d 454, 461 (4th Cir. 2012)).  However, "in pretext cases a plaintiff need prove only that the

14  illicit factor 'played a role in the [defendant's] decisionmaking process and that it had a

15  determinative effect on the outcome of that process.'"  *Newman v. GHS Osteopathic, Inc.*, 60

16  F.3d 153, 158 (3d Cir. 1995) (citing *Miller v. CIGNA Corp.*, 47 F.3d 586, 598 (3d Cir. 1995));

17  *see also Baird v. Rose*, 192 F.3d 462, 468–470 (4th Cir. 1999) (specifically rejecting the sole

18  cause test for ADA claims).

19      In the declaration submitted by Defendants, Sheriff Snaza stated that around the same

20  time Plaintiff began operating its SSP, "we started having issues with large groups of intravenous

21  drug users creating unsafe and unsanitary conditions throughout the county."  (Dkt. No. 44 at 3.)

22  Sheriff Snaza described a specific encampment that Plaintiff operated its mobile clinic as

23  "unimaginable conditions," and believed that the encampment would not have grown to the size

24

1   it did if not for Plaintiff's SSP.  (*Id.* at 4.)  Sheriff Snaza learned that Plaintiff considered

2   expanding its mobile SSP to more remote areas of the county and stated, "based on my

3   observations and experience that in the locations where [Plaintiff] was operating its SSP,

4   instances of reported drug use increase exponentially."  (*Id.*)  Sheriff Snaza believed Plaintiff's

5   SSP "was having a negative effect on the health and safety of the county" and he participated in

6   the public comment proceedings to support the Ordinance by expressing his concerns.  (*Id.*)

7   Declarations from other local police officers stated the SSP made "certain areas of the city where

8   [Plaintiff] operated more attractive to active drug users," made drug use "more accessible," and

9   overall emphasized the amount of drug paraphernalia in the community before the passage of the

10  Ordinance.  (Dkt. Nos. 46 at 2; 47 at 2-3.)

11       "It is clear that insofar as the Rehabilitation Act [or the ADA] evinces a general

12  recognition of substance abuse as a disease, discrimination on the basis of such a handicap is

13  antithetical to one of the goals of the Act—to ensure that persons . . . are not victimized . . . by

14  . . . *stereotypical assumptions concerning their handicap*."  *Teahan v. Metro–North Commuter R.*

15  *Co.*, 951 F.2d 511, 518 (2d Cir. 1991) (emphasis added).  Therefore, where the discrimination

16  results from unfounded fears and stereotypes that merely because Plaintiff's patients suffer from

17  addiction, they would necessarily attract increased drug activity and crime to the city, such

18  discrimination violates the ADA and Rehabilitation Act.  *Id.*

19       Moreover, the Court agrees that the Ordinance appears to "facially target[] health

20  services designed for, and that cannot be divorced from, people with SUD."  (Dkt. No. 25 at 19.)

21  The central focus of Gather's mobile SSP is to "meet[] people where they are, building trust, and

22  supporting progress toward better health and a more hopeful future."  (Dkt. No. 25-2 at 4.)  The

23  "people" in this case are those suffering from SUD and against whom the Ordinance denies

24

health services via Plaintiff's mobile SSP. This is a form of proxy discrimination which "arises when the defendant enacts a law or policy that treats individuals differently on the basis of seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group." *Schmitt v. Kaiser Found. Health Plan of Washington*, 965 F.3d 945, 958 (9th Cir. 2020) (quoting *Davis v. Guam*, 932 F.3d 822, 837 (9th Cir. 2019)). Though appearing seemingly neutral, the Ordinance on its face discriminates against people suffering from SUD by limiting their access to Plaintiff's mobile SSP, i.e., health services.

In summary, Plaintiff has established a likelihood of success on the merits of its ADA claim. Here, the record indicates the Ordinance violates the ADA because it impermissibly prohibits disabled individuals from receiving health services based on their disability while at the same time prohibiting Plaintiff from offering those services because of its association with such disabled individuals.

2. <u>WLAD</u>

Under the WLAD, individuals have the right to be free from discrimination because of "the presence of any sensory, mental, or physical disability," and this is a "general civil right." Wash. Rev. Code § 49.60.030(1). The WLAD defines "disability" as "a sensory, mental, or physical impairment that: (i) is medically cognizable or diagnosable; or (ii) exists as a record or history; or (iii) is perceived to exist whether or not it exists in fact." Wash. Rev. Code § 49.60.040(7)(a). An "impairment" includes, in pertinent part, "[a]ny physiological disorder or condition . . . affecting one or more of the following body systems: . . . neurological." Wash. Rev. Code § 49.60.040(7)(c)(i). The Washington Supreme Court had previously stated, "[T]he WLAD is broader than its federal counterpart, the [ADA], and we decline to use federal

interpretations of the ADA to constrain the protections offered by the WLAD." *Taylor v. Burlington N. R.R. Holdings, Inc.*, 444 P.3d 606, 609 (Wash. 2019); *see also Kumar v. Gate Gourmet, Inc.,* 180 Wash.2d 481, 500, 325 P.3d 193 (2014) ("Washington courts construe the WLAD's protections broadly."); Wash. Rev. Code § 49.60.020 (instructing courts to construe the WLAD "liberally for the accomplishment of the purposes thereof").  In so holding, the *Taylor* court recognized that the Washington legislature "intended to adopt a broad and expansive definition of 'disability' in order to protect against discrimination" and had "expressly rejected the idea that the ADA should be used to constrain the protections offered under the WLAD." 444 P.3d at 611.

Plaintiff has established that the individuals it serves have disabilities including "SUD, ADHD, traumatic brain injury, sciatica, and other mobility and mental health impairments that substantially limit their major life activities, including thinking, concentrating, brain neurological functions." (Dkt. No. 25 at 16-17.)  The WLAD does not include an exception barring current illegal drug users from the definition of "disabled."  Therefore, for the same reasons that Plaintiff had established a likelihood of success on the merits of its ADA claim, so too does it establish a likelihood of success on the merits of its WLAD claim.[8]

3.  <u>Preemption</u>

State law preempts a local ordinance if the "statute occupies the field, leaving no room for concurrent jurisdiction, or if a conflict exists such that the statute and the ordinance may not be harmonized." *Lawson v. City of Pasco*, 230 P.3d 1038, 1040 (Wash. 2010).  Plaintiff contends the Ordinance is preempted because it prohibits distribution of public health supplies in

---

[8] Defendants failed to substantively respond to this claim in their responsive briefing, instead arguing "it is impossible for the County to respond further."  (Dkt. No. 42 at 30.)

1   violation of Washington Revised Code § 69.50.4121(3); therefore, it argues there is conflict

2   preemption between the Ordinance and state law.  (Dkt. No. 25 at 26-27.)  A local law "must

3   yield" to a state statute on the same subject matter if "'a conflict exists such that the two cannot

4   be harmonized.'"  *Weden v. San Juan Cnty.*, 958 P.2d 273, 281 (Wash. 1998) (quoting *Brown v.*

5   *City of Yakima*, 807 P.2d 353 (Wash. 1991)); WASH. CONST., art. XI, § 11.  An ordinance is

6   consistent with article XI, section 11 unless it, relevant here, "prohibits what the state law

7   permits."  *Dep't of Ecology v. Wahkiakum Cnty.*, 337 P.3d 364, 367 (Wash. Ct. App. 2014).

8           § 69.50.4121(3) states, "Nothing in subsection (1) of this section prohibits distribution or

9   use of public health supplies including, but not limited to, *syringe equipment, smoking*

10  *equipment, or drug testing equipment*, through public health programs, community-based HIV

11  prevention programs, outreach, shelter, and housing programs, and pharmacies."  (Emphasis

12  added.)  Thus, Washington allows for the distribution of syringe equipment and drug testing

13  equipment through SSPs without any limitation.  However, the Ordinance limits needle

14  exchanges to a one-to-one exchange, and prohibits the distribution of any other "drug

15  paraphernalia."  Lewis County Code § 8.80.050.  "[D]rug paraphernalia" is defined as "all

16  equipment, products, and materials of any kind which are used, intended for use, or designed for

17  use in . . .  processing, preparing, testing, [or] analyzing" a controlled substance.  *Id.*

18  § 8.80.020(6).

19          The Ordinance irreconcilably conflicts with the authority granted to public health

20  programs under § 69.50.4121(3), and the two cannot be harmonized.  Essentially, the Ordinance

21  is a local regulation that prohibits what state law permits: the ability to distribute or use syringe

22  equipment, smoking equipment, or drug testing equipment.  A local regulation that conflicts with

23  state law fails in its entirety.  *See Adams v. Thurston Cnty.*, 855 P.2d 284, 289-290 (Wash. Ct.

24

App. 1993) (holding that a county ordinance conflicted with state laws and was invalid as applied to all citizens).[9]  Therefore, Plaintiff has established a likelihood of success on the merits of its preemption claim.

### B.  Irreparable Harm

Plaintiff asserts it faces three forms of irreparable harm: (1) irreparable harm inherent in a violation of a federal civil rights statute, (2) irreparable harm its patients face based on their risk of infection and disease transmission from not being allowed sterile needles on an as-needed basis, and (3) irreparable harm to Plaintiff's ability to fulfill its religious mission of serving the most vulnerable members of its community.  (Dkt. No. 25 at 28.)

First, because the Court concludes there is a likelihood of success on the merits of Plaintiff's ADA claim, it presumes Plaintiff and those it serves have and will suffer irreparable injury.  *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001) ("Where a defendant has violated a civil rights statute, we will presume that the plaintiff has suffered irreparable injury from the fact of the defendant's violation.").  As to the second form of irreparable harm, Plaintiff relies heavily on Dr. Bluthenthal's declaration to show that the Ordinance has created a public health crisis in Lewis County.  Dr. Bluthenthal stated the SSP distributed "lifesaving public health supplies shown to substantially reduce the risk of disease transmission, overdose, and death from injecting drugs."  (Dkt. No. 25-7 at 22.)  Dr. Blunthenthal further opined that the Ordinance will result in individuals reusing or sharing

---

[9] Defendants argue that Washington Revised Code § 69.50.612, entitled "State Preemption—Drug Paraphernalia," is the "only relevant statute." (Dkt. No. 42 at 29.)  § 69.50.612(2) states, "Nothing in this chapter shall be construed to prohibit cities or counties from enacting laws or ordinances relating to the establishment or regulation of harm reduction services concerning drug paraphernalia."  However, as pointed out in Plaintiff's reply brief, it has not argued field preemption, but instead conflict preemption.  (Dkt. No. 52 at 15.)

syringes to inject drugs, causing them to "face a dramatically elevated risk of contracting HIV, Hepatitis C, or another serious communicable disease, and continued sharing of syringes will inevitably lead to disease transmission, including into the Lewis County community." (*Id.* at 25.) Similar to *Immigrant Legal Resource Center v. City of McFarland*, 472 F. Supp. 3d 779, 785 (E.D. Cal. 2020), where the court enjoined the city from transferring detainees to reduce "unnecessary risks to public health related to COVID-19," the Court concludes Plaintiff has sufficiently shown a public health risk absent an injunction arising out of a likely ADA violation.[10]

Finally, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)); *see also Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) ("A colorable First Amendment claim is irreparable injury sufficient to merit the grant of relief.") (internal quotation marks omitted). As the Ninth Circuit has explained, "'[i]rreparable harm is relatively easy to establish in a First Amendment case' because the party seeking the injunction 'need only demonstrate the existence

---

[10] In *Immigrant Legal Resource Center* ("*ILRC*"), two non-profit organizations that provide services to immigrant detainees sought a temporary restraining order against the City of McFarland and a corporation in part to bar the corporation from transferring detainees within its facilities. 472 F. Supp. 3d at 785. The district court granted the injunction, finding that "preventing detainee transfers is an effective method for reducing unnecessary risk to public health related to COVID-19, and that absent an injunction, there is an imminent threat of irreparable harm resulting from detainee transfers." *Id.* at 785. The court subsequently granted the plaintiffs' request for a preliminary injunction. *ILRC v. City of McFarland*, 478 F. Supp. 3d 988, 993 (E.D. Cal. 2020), *vacated and remanded*, 827 Fed. Appx. 749 (9th Cir. 2020) (unpublished). However, the Ninth Circuit concluded the district court abused its discretion by focusing its irreparable harm analysis on the prospect of harm to third parties, as the standard for preliminary injunctions "requires irreparable harm to the plaintiffs themselves." *ILRC v. City of McFarland*, 827 Fed. Appx. 749, 751 (9th Cir. 2020) (unpublished). The Court notes *ILRC* did not involve an ADA claim, which eliminates prudential barriers for asserting injury based on associational discrimination claims.

of a colorable First Amendment claim.'" *Fellowship of Christian Athletes*, 82 F.4th at 694–95

(quoting *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics,* 29 F.4th 468, 482 (9th

Cir. 2022)).  Pastor Meckle stated that Plaintiff's "work has suffered tremendously because of

the Ordinance" because it is "no longer able to serve the community as fully as [it] once did,"

and "cannot meaningfully engage with people struggling with SUD which is a central part of

[Plaintiff's] religious mission."  (Dkt. No. 25-2 at 13.)  Defendants offer no evidence challenging

the sincerity of Plaintiff's religious beliefs or mission.  Nor do Defendants argue that Plaintiff's

religious exercise is unburdened by the Ordinance's prohibitions.  The Court finds Plaintiff has

put forward a colorable claim that the Ordinance impermissibly impacts its Free Exercise rights.

Defendants argue that Plaintiff's argument of irreparable harm is undercut by its delay in

filing the present lawsuit and moving for a preliminary injunction—the Ordinance had been in

effect for 18 months before Plaintiff filed suit.  (Dkt. No. 42 at 31-32.)  Defendants contend

Plaintiff "was not only aware of the Ordinance's provisions ahead of time, but had sent formal

letters to the County, written by the same lawyers representing [Plaintiff] here, threatening the

exact claims [Plaintiff] eventually brought."  (*Id.* at 32.)

First, though the Ordinance passed in April 2024, the Ordinance contains a sunset

provision relating to operation of mobile exchanges: "Any program operator conducting a mobile

exchange in Lewis County using a mobile vehicle at the time this chapter is enacted may

continue until December 31, 2025, to use the mobile vehicle for the operation of its needle and

hypodermic syringe exchange," provided it follows certain procedures.  Lewis County Code

§ 8.80.110(1)(a).  Plaintiff currently operates its SSP clinic from its mobile clinic that is parked

outside its community services building.  (Dkt. No. 25-2 at 11.)  After December 31, 2025,

Plaintiff will be forced to relocate its SSP into another building, requiring Plaintiff to perform

construction to its property.  (*Id.* at 12.)  Thus, there is upcoming harm that Plaintiff will face

absent a preliminary injunction.

Second, delay is but a single factor to consider in evaluating irreparable injury; courts are

"loath to withhold relief solely on that ground."  *Lydo Enters., Inc. v. City of Las Vegas*, 745

F.2d 1211, 1214 (9th Cir. 1984).  It is generally recognized that a "long delay before seeking a

preliminary injunction implies a lack of urgency and irreparable harm," *Oakland Tribune, Inc. v.

Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985), but "[d]elay by itself is not a

determinative factor in whether the grant of interim relief is just and proper."  *Aguayo ex rel.

N.L.R.B. v. Tomco Carburetor Co.*, 853 F.2d 744, 750 (9th Cir. 1988).  And although a failure to

seek speedy relief can imply the lack of a need for such relief, "such tardiness is not particularly

probative in the context of ongoing, worsening injuries."  *Arc. of Cal. v. Douglas*, 757 F.3d 975,

990 (9th Cir. 2014).  Here, the ongoing violation of a civil rights statute indicates ongoing injury

preventing Plaintiff from delivering health services to a disabled population and at the same time

increasing public health risks.  Moreover, Plaintiff's religious exercise is burdened each day the

Ordinance prohibits Plaintiff from pursuing its religious mission.

Under these circumstances, Plaintiff's delay in filings its complaint and seeking

preliminary injunctive relief does not significantly undercut its showing of irreparable harm.

### C.  Balance Of Equities and The Public Interest

"Where, as here, the party opposing injunctive relief is a government entity, the third and

fourth factors—the balance of equities and the public interest—'merge.'"  *Fellowship of

Christian Athletes*, 82 F.4th at 695 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Defendants do not address these factors in its response brief.  (*See generally* Dkt. No. 42.)  Here,

Plaintiff has established the Ordinance not only prevents Plaintiff from fulfilling its religious

1    mission but also severely limits services which facilitated access to SUD treatment and health

2    services.  The balance of equities, therefore, tip sharply in Plaintiff's favor.  Based on the record

3    before the Court, the third and fourth factors support granting Plaintiff's motion for a preliminary

4    injunction.

### V.    CONCLUSION

6        For the reasons discussed above, the Court finds Plaintiff has met the necessary

7    requirements for a preliminary injunction.  Accordingly, Plaintiff's motion for a preliminary

8    injunction is GRANTED.  (Dkt. No. 25.)  Defendants are HEREBY ENJOINED during the

9    pendency of this litigation from enforcing Lewis County Ordinance 1354, codified at Lewis

10    County Code Chapter § 8.80, against Plaintiff in this action.

11        Dated this 31st day of December, 2025.

David G. Estudillo
United States District Judge